NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10977


COMMONWEALTH  vs.  WILLIAM WOOD.



Suffolk.     March 7, 2014. - August 7, 2014.

Present:  Ireland, C.J., Cordy, Botsford, Gants, & Lenk, JJ.[1]


Homicide.  Felony-Murder Rule.  Robbery.  Evidence, Third-party
    culprit, Relevancy and materiality, Hearsay, Prior
    misconduct, Joint venturer, Expert opinion, Testimony
    before grand jury.  Jury and Jurors.  Constitutional Law,
    Confrontation of witnesses.  Witness, Expert.  Perjury.
    Grand Jury.  Practice, Criminal, Capital case, Hearsay,
    Jury and jurors, Confrontation of witnesses, Argument by
    prosecutor, Grand jury proceedings, Conduct of prosecutor,
    Verdict, Question by jury, Duplicative convictions.  Joint
    Enterprise.




    Indictments found and returned in the Superior Court
Department on May 4, 2004.

    The cases were tried before Patrick F. Brady, J.


    Stephen Neyman for the defendant.
    Cailin M. Campbell, Assistant District Attorney (Patrick
Haggan, Assistant District Attorney, with him) for the
Commonwealth.

_____

    [1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

CORDY, J. In the early morning hours of February 13, 2004, Betsy Tripp was bound with telephone wire and murdered in her home, a condominium on Monsignor Way in the Dorchester section of Boston. Her throat was slit. The man who shared the condominium with her, Morris Thompson, was shot in the face, coming close to death, and losing an eye. The perpetrators fled in a vehicle that Thompson had borrowed from a neighbor in the condominium complex and for which Thompson had the keys. The vehicle was abandoned in the parking lot of a Dorchester elementary school and set ablaze shortly after 2 A.M. that same morning.

Thompson survived his wounds and accused the defendant, William Wood, and Wood's friend, Quincy Butler, of committing the crimes in the course of a botched kidnapping and robbery attempt. Both were charged with murder and related crimes,[2] and were tried together. There were four trials. Two ended in mistrials when the jury were unable to unanimously agree on a verdict. A third resulted in mistrial when the trial judge became ill during trial. At the fourth trial, which is the

---

[2] The defendant, William Wood, was charged with murder in the first degree, armed carjacking, two counts of kidnapping, armed home invasion, two counts of armed robbery, assault and battery by means of a dangerous weapon (a handgun), larceny of a motor vehicle, and malicious destruction of property over $250. Quincy Butler was charged with the same offenses, in addition to one count of possession of a firearm.

subject of this appeal, the defendant was convicted of murder in the first degree on theories of felony-murder and extreme atrocity or cruelty.[3]  Butler was convicted of murder in the second degree, and his appeal is pending in the Appeals Court.

As outlined further below, the principal witnesses for the Commonwealth were Thompson and Butler's former roommate and girl friend at the time of the murder, Laura DaSilva.  DaSilva's testimony included her observations regarding the kidnapping at gunpoint of Thompson from her apartment by the defendant and Butler shortly before the murder; her observations of the defendant and Butler when they returned to her apartment at approximately 3 A.M. on February 13 and disposed of their clothing, including what appeared to be bloody gloves; and admissions made to her by Butler later that same morning regarding what he and the defendant had done at Tripp's condominium.

Both the defendant and Butler testified at trial, essentially denying their involvement in the crimes.  In addition to their testimony, the defense focused on the lack of forensic evidence tying either of them to the crime scene, what

---

[3] The defendant was also convicted of armed carjacking, two counts of kidnapping, armed home invasion, two counts of armed robbery, and larceny of a motor vehicle.  The judge dismissed his convictions on both counts of armed robbery as duplicative of his conviction of felony-murder in the first degree.  The defendant was acquitted of assault and battery by means of a dangerous weapon on Morris Thompson.

they claimed was an inadequate police investigation, and, relatedly, the possibility that Thompson or one of Thompson's drug-related associates had committed the crimes.  The outcome of the case, to a large degree, turned on the jury's assessment whether the Commonwealth's principal witnesses or the codefendants were telling the truth.

On appeal, the defendant raises numerous claims of error. For the reasons stated below, we find no reversible error, and discern no basis to exercise our authority under G. L. c. 278, § 33E, to reduce or reverse the murder verdict.  Consequently, we affirm the defendant's convictions.  We also reinstate the defendant's two convictions of armed robbery, the underlying felonies in the felony-murder conviction, which the judge dismissed as duplicative.  As we have concluded in similar circumstances, those convictions are not duplicative where the defendant is also convicted on another theory of murder in the first degree, here murder with extreme atrocity or cruelty. Commonwealth v. Gambora, 457 Mass. 715, 734 (2010) ("if a jury return a special verdict specifying felony-murder as one of several theories under which they convicted the defendant, the underlying felony remains a distinct crime").  Commonwealth v. Raymond, 424 Mass. 382, 396-397 (1997) (same).

1.  Background.  We summarize the facts as the jury could have found them, in the light most favorable to the Commonwealth.  Commonwealth v. Sanna, 424 Mass. 92, 93 (1997).

a.  The murder.  Thompson and Tripp began dating eight years prior to her death in 2004, and moved into a condominium in Dorchester together in 2001 or 2002.  Thompson received disability checks every month and also worked odd jobs, often as a doorman at various Boston nightclubs or as a construction worker.

In February, 2004, Thompson's neighbor, Mitra Ghobadi, asked him to refurbish her apartment.  He determined that he needed help to finish the job on time.  DaSilva had lived with Thompson and Tripp for some time to escape an abusive former boy friend, and Thompson decided to enlist the help of her new boy friend, Butler.  Thompson testified that he knew Butler as "Q."[4]

DaSilva testified that on the evening of February 12, Thompson drove to her house in Boston with an "eight ball" of "crack" cocaine.  He smoked the crack cocaine with DaSilva, Butler, and two other residents of the apartment in DaSilva's bedroom.[5,6]  Thompson told Butler that he would pay him $200 at

---

[4] Butler testified that he had met Morris Thompson numerous times at Laura DaSilva's apartment.

[5] Thompson repeatedly denied being a drug user and testified that he did not smoke "crack" cocaine that night.

the end of the following day for his assistance refurbishing Ghobadi's apartment. Butler responded that he had a friend who could help them get through the work more quickly. Thompson agreed, and said that Butler and his friend could split the $200.

At some point, the defendant entered the bedroom. Butler told DaSilva to follow him to the bathroom to talk with him. Once there, Butler said "that he was taking [Thompson] out and [Thompson] wasn't coming back to the house."

Thompson became uneasy at the sight of the defendant, and something "just didn't feel right." At that point, Butler said, "We're gonna get paid tonight," pulled out a silver revolver with a black handle,[7] and put the gun to Thompson's head, while the defendant went through Thompson's pockets. The defendant took Thompson's automobile keys, money, and wallet, while DaSilva sat and watched from the bed, silently.

After taking Thompson's money, Butler and the defendant took Thompson to his automobile.[8] The defendant drove while

---

[6] The two other residents retired to their bedroom after smoking and did not witness or take part in the armed robbery or its aftermath.

[7] Laura DaSilva testified that she had seen the defendant give the gun to Butler months earlier.

[8] On the night of the murder, Morris Thompson drove Mitra Ghobadi's automobile, which she had lent to him after the automobile he shared with Betsy Tripp was damaged. As the

Thompson sat in the passenger seat and Butler sat behind him holding the gun to Thompson's head. The group arrived at Thompson's and Tripp's condominium building sometime after midnight. After asking if the building had any security cameras, the defendant and Butler walked Thompson to the front door of the building and used his keys to open it. When they then entered the condominium unit, Tripp was sleeping in the bedroom.

The defendant and Butler ripped a telephone cord from the wall and tied Thompson up with his hands behind his back in the living room. They also woke Tripp and tied her in a similar manner. They demanded money, and the defendant rummaged through the house while Butler sat holding Thompson at gunpoint. Eventually they demanded Tripp's automated teller machine (ATM) card and its personal identification number (PIN),[9] which she gave to the defendant. The defendant left the house to use the ATM, while Butler stayed, "beating [Thompson] around on the floor."

---

distinction is not relevant, we refer to the vehicle as Thompson's for the sake of brevity.

[9] The defendant testified that he had previously met Thompson through DaSilva and occasionally sold him crack cocaine. He also testified that he had Tripp's automated teller machine card because Thompson had traded it to him in exchange for crack cocaine on February 12, 2004, several hours before the murder.

The defendant went to an ATM in Codman Square, which was located a few minutes from Thompson's and Tripp's building. Between 1:49 and 1:50 <u>A</u>.<u>M</u>., he tried to withdraw money from the ATM five times, before successfully obtaining forty dollars. One minute later, he went to another ATM in the area and unsuccessfully tried to withdraw more money.  He then returned to the condominium.

On his return, the defendant told Butler that he did not get any money.  Tripp explained that her account was empty because a check she had received had not cleared yet.  At that point, the defendant went into the kitchen, returned with a knife, grabbed Tripp by the back of the head, and cut her throat.

On hearing Tripp scream, Thompson jumped up and tried to push the defendant out of the way.  As Thompson jumped toward the defendant, Butler fired one shot and hit Thompson in the side of the head.[10]  The bullet exited near his left eye. Thompson immediately lost consciousness and fell to the floor. When he awoke, Tripp was lying beside him, bleeding and barely alive.  He broke out of his restraints and went into the hallway looking for help from his neighbors.

---

[10] Butler fired a second shot, which hit Tripp in the arm, after Thompson lost consciousness.

On answering a knock at his door, Richard Young, Thompson's neighbor, found Thompson bleeding profusely with his left eye hanging out of its socket.  Thompson testified that he told Young, "A guy named 'Q' shot me in the head, and Will cut my girlfriend's throat."[11]  Young told his wife to telephone 911, and he telephoned the fire department.  Within minutes, the police and emergency medical technicians (EMTs) arrived.  Thompson repeatedly told the police and medical personnel on the scene that "'Q' shot him."  At some point, Young also heard Thompson say, "My girlfriend is in the apartment."

The police found Tripp lying on the floor.  She was covered with clothes, and she had a "deep," significant slash across her neck.  She was still alive and struggling to breathe as EMTs attended to her, but she was pronounced dead on arriving at Boston Medical Center.

After the shooting, the defendant and Butler took Thompson's automobile to the nearby Fifield Elementary School and set it on fire.  At approximately 3 A.M., they returned to DaSilva's house.  The two went into DaSilva's bedroom, took off their clothes, and placed them in a plastic bag.  DaSilva noticed a pair of black leather gloves that appeared to be stained with blood, prompting her nervously to ask them if it

---

[11] Thompson admitted that he was not sure if Richard Young understood him, and in fact Young testified only that Thompson said, "I've been shot."

was blood.  Neither responded, and instead Butler counted some money and gave it to the defendant, who said that after the stress he had just been through he wanted to get high, to which Butler responded, "No, not right now, nobody's getting high right now."

After the defendant left DaSilva's house, she went to take a shower.  Butler followed her into the bathroom and told her that he (rather than the defendant) had slit Tripp's throat, saying, "She didn't have to die like that."[12]  Butler told her that he and the defendant had tied Thompson and Tripp with telephone wire before taking Tripp's ATM card.  Butler added that the defendant went to get money from the ATM, and that the defendant told Tripp that, if he did not get any money, he was going to slit her throat.  Butler also stated that Thompson started to free himself while he (Butler) was cutting Tripp's throat, and the defendant responded by shooting Thompson.

---

[12] DaSilva consistently testified at trial that Butler told her that he, rather than the defendant, killed Tripp, and that the defendant shot Thompson.  What Butler told DaSilva may have been part of his effort to frighten her into silence.  Thompson testified consistently at trial that he observed the defendant kill Tripp, and that Butler shot him.  Based on the jury verdict (the defendant guilty of murder in the first degree on theories of felony-murder and extreme atrocity or cruelty, and Butler guilty of murder in the second degree), it seems likely that the jury believed Thompson's testimony and discounted Butler's overstating of his role in the murder of Tripp and the shooting of Thompson in his recounting of the details to DaSilva.

Finally, he said that the two left under the assumption that both Thompson and Tripp were dead.

b. The investigation. The police investigation got underway immediately after the murder. Extensive fingerprint and deoxyribonucleic acid (DNA) testing on the clothing, knives, and other surfaces found in the condominium was conducted, but did not conclusively link either the defendant or Butler to the crime scene.

On February 20, 2004, Boston police detectives asked Butler and DaSilva to come to police headquarters and make statements. DaSilva was afraid Butler would harm her children if she implicated him in the murder.[13] As a result, DaSilva lied to the police and told them that Butler had been with her at the time Tripp was killed. Later, Butler encouraged her to keep her false story consistent.

On February 23, Thompson gave a statement to Boston police detectives in which he repeated that Butler had shot him and that the defendant had slit Tripp's throat. The detectives intended to conduct a photographic array, when one of them

---

[13] DaSilva testified that Butler took her to a hotel one or two days after the murder and told her that he might have to kill the defendant because Thompson had survived. He also told her that she was to tell the police that he, Butler, stayed with her the whole night of the murder and did not go anywhere. When DaSilva suggested she might kill herself, Butler told her that if she died he would kill her three children. This conversation made her very frightened for the safety of her children.

knocked over his bag, causing a piece of paper showing six photographs to fall out. Thompson saw the paper, recognized the defendant's picture, and said, "That's the guy that had cut Betsy's throat." He later identified Butler as the shooter in another photographic array.

On February 26, the detectives asked DaSilva to come back to the police station for further questioning. Once at the station, DaSilva admitted that she had lied in her first statement because of her fear of Butler. She then gave a different account of what she witnessed the night of the murder, implicating Butler, although she testified at trial that she had still held back certain details, including some of Butler's admissions to her. Butler and the defendant were then arrested and subsequently indicted.[14] We address other relevant facts as they arise below.

2. Discussion. a. Third-party culprit and Bowden evidence. In a pretrial motion joined by Butler, the defendant sought to introduce, through several witnesses and cross examination, evidence intended to show that a third party -- likely Thompson -- killed Tripp, as well as evidence that the

---

[14] DaSilva testified that in March, 2004, after Butler and the defendant were arrested and in jail, she received a telephone call from a third party accompanied by Butler and the defendant in a three-way conference call. Butler and the defendant asked her what she had told the police, and she denied having spoken to them. They then reiterated that she was not to talk to the police.

police failed to investigate certain statements implicating Thompson. We discern no error in the judge's rulings excluding much of the proffered evidence.

The defendant sought to introduce testimony from Natalie Shaheen, a friend of Tripp, recalling several statements made to her by Tripp, purportedly showing a deteriorating relationship. Specifically, it was represented that Shaheen would testify that Tripp had told her that Thompson had been abusive toward her for years, both threatening and inflicting physical injury; that she was frightened of Thompson and the people he brought over to the condominium as a consequence of his crack cocaine habit, and did not feel safe in her own home; and that Thompson had told Tripp many times that he would kill her. Sheehan would also have testified that Tripp had planned to tell Thompson to move out of her home, and that Tripp feared that Thompson was "catching on" to her plan. Finally, Sheehan would have testified that Tripp stated to her that if she were killed, it would be Thompson who killed her.

The defendant also sought to introduce evidence through his cross-examination of Thompson. In particular, he intended to question Thompson regarding his substance abuse history in order to impeach his expected testimony that he had only used crack cocaine once, and that he did not use it on the night of the murder.

He also intended to question Thompson regarding an incident between Thompson and a woman named Laura Buchman, in which Buchman stole a camera from Thompson over a drug dispute and Thompson allegedly paid several people to beat Buchman up in retaliation.  He further intended to call Buchman as a witness to describe the camera incident and testify that she and Thompson often used crack cocaine together without Tripp's knowledge, and that Thompson acted "crazy" when using cocaine.

The judge excluded all the proffered evidence from Shaheen and Buchman as either hearsay or irrelevant, and allowed the defendant to inquire as to Thompson's possession and use of drugs and his dealings with a drug dealer known as "Tony" or "T" only in the days immediately preceding the murder.  With regard to Shaheen, the judge determined that her proposed testimony was hearsay that did not fall within any exception.  He noted that none of the proffered evidence provided a substantial connecting link to any third-party culprit.  In particular, he stated, "Looking at the whole picture I can't see Thompson as third party culprit.  I can't rationally, without an incredible imagination, I can't picture him being the culprit.  And as far as a third party unknown drug dealer being the culprit, it just seems too farfetched and feeble."

"The standard applicable to admission of third-party evidence in Massachusetts is well settled . . . ."  <u>Commonwealth</u>

v. Buckman, 461 Mass. 24, 30 (2011), cert. denied, 132 S. Ct. 2781 (2012).  "Third party culprit evidence is 'a time-honored method of defending against a criminal charge.'"  Commonwealth v. Silva-Santiago, 453 Mass. 782, 800 (2009), quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996).  "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it."  Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989), quoting Commonwealth v. Harris, 395 Mass. 296, 300 (1985).

A judge's discretion to admit third-party culprit evidence is not without limits.  The proffered evidence "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative."  Silva-Santiago, 453 Mass. at 801, quoting Rosa, 422 Mass. at 22.  See Buckman, 461 Mass. at 32.  Further, if the evidence is hearsay not falling within any exception, it is admissible only if it is "otherwise relevant, will not tend to prejudice or confuse the jury, and there are other 'substantial connecting links' to the crime."  Silva-Santiago, supra, quoting Commonwealth v. Rice, 441 Mass. 291, 305 (2004).  "Because the issue is one of constitutional dimension, we are not bound by an abuse of discretion standard, but rather examine the issue

independently." Commonwealth v. Conkey, 443 Mass. 60, 66-67 (2004), S.C., 452 Mass. 1022 (2008).

The judge did not err in excluding the proffered third-party culprit evidence here. First, the entirety of Shaheen's proffered testimony was inadmissible hearsay, and as such was required to have "substantial connecting links" to the crimes. See Buckman, 461 Mass. at 32 ("Third-party culprit evidence is offered for the truth of the matter, and as such it must have substantial probative value in connecting a third person to the crime"). While Shaheen's testimony may have shown that the relationship between Thompson and Tripp was strained, any inference that Thompson was the culprit is entirely unsupported by any evidence. Thompson's testimony as to the events of the evening was largely consistent with DaSilva's testimony, based on her observations and Butler's admissions to her.[15] It was also consistent with what the responding police and EMTs observed when they arrived at the scene. The judge concluded, and we agree, that it strains credulity, and is entirely speculative, that Thompson slit Tripp's throat, shot himself, survived, discarded a firearm, and fabricated a story implicating the defendant and Butler while suffering from a

---

[15] There is nothing in the record to suggest that Thompson and DaSilva ever had any opportunity or incentive to collude in constructing consistent versions of the event that evening. Indeed, Thompson indicated during his testimony that he believed DaSilva had organized the robbery.

painful and blinding wound that, according to the responding officers, appeared to be "fatal." See Commonwealth v. O'Brien, 432 Mass. 578, 588-589 (2000) (conversation between victim and friend about victim's fear of brother-in-law insufficient to suggest he was third-party culprit who had motive, intent, and opportunity to commit crime).

The same is true of the proffered evidence that Thompson was a heavy drug user, had a violent past, and had threatened Buchman. Where the overwhelming weight of the evidence was contrary to Thompson being the culprit, and where there was no evidence suggesting his complicity in the killing, the judge did not err in concluding that evidence of these prior bad acts did not support any rational inference linking Thompson to the crime.

Moreover, where a defendant seeks to admit prior bad acts of an alleged third-party culprit, he must show that "the acts of the other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." Conkey, 443 Mass. at 66, quoting Commonwealth v. Hunter, 426 Mass. 715, 716-717 (1998). Here, none of the excluded evidence was closely connected in time to the murder. Proffered evidence that would show that Thompson was a heavy drug user who occasionally acted "crazy" while using cocaine described

incidents that occurred long before the night of the murder. Similarly, his alleged dispute with Buchman and hiring of men to harm her after she stole a camera from him was evidence of an irrelevant prior bad act.  See Commonwealth v. Pimental, 454 Mass. 475, 479 (2009) (prior bad act of third-party culprit not admissible where it "shared no singular features or striking resemblance" with crime).  It also had no tendency to prove that anyone other than the defendant committed the crime, given that there is no reading of the record that suggests either that Buchman killed Tripp or that the incident was in any way related to the murder.

Finally, although the judge limited testimony regarding Thompson's prior drug use, he did allow evidence of Thompson's use of crack cocaine on the night of the murder and the days preceding it.  Defense counsel was permitted to ask whether Thompson used crack cocaine the night of the murder, whether crack cocaine was found in the pants he was wearing that night, and whether he had arranged to hold crack cocaine for a drug dealer named "Tony" or "T."  Defense counsel was also permitted to elicit testimony from other witnesses to the effect that Thompson smoked crack cocaine in the hours preceding the murder and that crack pipes were found in his bedroom.  Thus, although the judge barred testimony about the full extent of Thompson's drug use and his behavior while on drugs, the judge admitted

(and the jury heard) substantial testimony about Thompson's drug use in the days leading up to the murder and his dealings with "Tony," rendering the excluded evidence cumulative. See Commonwealth v. Greineder, 458 Mass. 207, 252 (2010); Commonwealth v. Alammani, 439 Mass. 605, 611-612 (2003).

The defendant also argues that Shaheen's statements about Tripp should have been admitted -- both through her own proffered testimony and that of Boston police Detective Russell Grant, to whom she relayed the information -- in furtherance of a Bowden defense. See Commonwealth v. Bowden, 379 Mass. 472, 486 (1980). Pursuant to a Bowden defense, a defendant may introduce evidence regarding the police investigation in order to create an inference "that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation may have led to significant evidence of the defendant's guilt or innocence." Silva-Santiago, 453 Mass. at 801. "[T]he failure of the police to investigate leads concerning another suspect is sufficient grounds for a Bowden defense." Id. at 802. See Commonwealth v. Phinney, 446 Mass. 155, 166 (2006) (police reports admissible to show that police were on notice of suspect but failed to investigate possible involvement in murder). "[T]he exclusion of evidence of a

Bowden defense is not constitutional in nature and therefore is examined under an abuse of discretion standard." Silva-Santiago, supra at 804 n.26.  To determine whether a judge abused his or her discretion in declining to admit such evidence, the judge must determine whether the proffered third-party culprit evidence was provided to the police and, if so, whether the probative weight of the evidence outweighed the risk of unfair prejudice to the Commonwealth from turning the jury's attention to "collateral matters."  Id. at 803.

As part of the police investigation, Detective Grant interviewed Shaheen on February 22, 2004, during which she provided essentially all of the third-party culprit evidence that her proffered testimony would have encompassed.  That evidence was properly excluded, however, because its probative value was negligible.  At best, the evidence would have shown that police failed to investigate Thompson as a suspect despite being aware of his drug use and his deteriorating relationship with Tripp.  However, where there was no evidence suggesting that Thompson killed Tripp, or was in any way involved in her death, the judge properly concluded that the evidence would have been far more prejudicial than probative.

In any event, the defense was permitted to challenge the adequacy of the police investigation as a whole.  Counsel for both defendants extensively cross-examined Grant about his

investigation, emphasizing the fact that Grant was aware that Thompson had repeatedly lied to the police, and that Grant had done very little to find "T," despite having information suggesting that he had allegedly fronted Thompson an eight ball of crack cocaine only days before the murder.[16]  Defense counsel also argued in his closing, "The police in this case did not do the job that each and every one of you should expect to be done," and argued that a further investigation of Thompson's drug use might have uncovered a third-party drug dealer or user who may have committed the crime.  Thus, where the issue of an inadequate investigation was fairly before the jury, the defendant suffered no prejudice from the exclusion of the proffered evidence.

b.  Hearsay statements.  The defendant argues that the judge erred in allowing DaSilva to testify about the statements made by the defendant to Butler, which were later relayed to her, and statements made by Butler to her during the days following the murder.  Because the testimony in question falls within the joint venture exception to the hearsay rule, we conclude that there was no error.

Defense counsel objected to the introduction of statements made by Butler to DaSilva, arguing that the Commonwealth had not

---

[16] Defense counsel through cross-examination and the calling of its own expert extensively challenged the adequacy of the forensic investigation conducted by the police.

as of the time of her testimony shown that Butler and the defendant were engaged in a joint venture. The judge denied the motion, and defense counsel requested an instruction as to the joint venture exception to the hearsay rule.[17] The judge instructed the jury, in relevant part:

> "[Y]ou may consider against an individual defendant, in this case, specifically, Mr. Wood, who is not alleged to have been a party to this conversation, any statements made by the other alleged participant in the joint venture, that is allegedly Mr. Butler, only if three things have been proved to you about that statement, this is the statement allegedly made by Quincy Butler. First, that other evidence, apart from the statement, shows that there was a joint venture between the speaker, that's allegedly Mr. Butler, and the defendant, Wood. Second, that the statement was made during the joint venture including the concealment phase if any. And third, that the statement was made in order to further or help along the goal of the joint venture including concealing the alleged crime."

After the limiting instruction, DaSilva testified as to the details of Butler's admissions to her on the night of the murder. She testified that Butler told her that the defendant took Tripp's ATM card and told Tripp that he would slit her throat if he did not get any money from her account. He went on to say that, when the defendant returned without any money, Butler slit Tripp's throat, Thompson broke free of the telephone cord, and the defendant shot Thompson in the face. DaSilva went

---

[17] The defendant's contention that he accepted the judge's offer to instruct the jury reluctantly, in order to mitigate the damage, is entirely unsupported by the record. The judge noted that, in the prior trials, defense counsel had asked the judge not to give an instruction, and asked if that was still his position. Defense counsel then asked for the instruction.

on to testify that, days later, she and Butler went to a hotel, where Butler told her that he and the defendant had burned Thompson's vehicle in the parking lot of the Fifield Elementary School, that Thompson was still alive, and that he "was going to have to take [the defendant] out" because the defendant did not succeed in killing Thompson.

"Under the joint venture exception to the hearsay rule, '[o]ut-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it.'" Commonwealth v. Hardy, 431 Mass. 387, 393 (2000), S.C., 464 Mass. 660 (2013), quoting Commonwealth v. Clarke, 418 Mass. 207, 218 (1994). "The judge need not make a preliminary finding that a joint criminal enterprise exists as a precondition to admitting the evidence." Commonwealth v. Colon-Cruz, 408 Mass. 533, 543 (1990). Instead, he or she may allow the admission of such statements "on the representation of the prosecution that the Commonwealth will subsequently introduce sufficient evidence to show that the defendant was part of the conspiracy," and instruct the jury that they may only consider the statements if they find that, at the close of evidence, the Commonwealth has proved the existence of a joint venture beyond a reasonable doubt. Commonwealth v. Borans, 379 Mass. 117, 145 n.26 (1979).

Here, the judge's instruction to the jury was appropriate, accurate, and presumably followed by the jury. See Commonwealth v. Ortiz, 463 Mass. 402, 416 (2012). The evidence clearly supported a finding by the jury that the defendant and Butler engaged in a joint venture to rob and murder Tripp.

Although the defendant contends that the joint venture had ended before Butler's statements were made, the evidence belies his argument. The defendant's argument that the joint venture had ended when Butler made his initial statements to DaSilva "has no merit in light of undisputed evidence that the challenged statements were made only a few hours after the crimes." Commonwealth v. Marrero, 436 Mass. 488, 494 (2002). Immediately before the statements were made, the defendant and Butler returned to DaSilva's home and disposed of their clothes in what was inferably an attempt to conceal evidence of the crimes. Given that the "interests of the [two] men were still closely bound together, tending to ensure the reliability of their statements," Colon-Cruz, 408 Mass. at 545, the initial statements were admissible.

The same is true of the statements made to DaSilva several days later at a hotel. The jury could have determined that Butler was still trying to "avoid detection and detention" at the time, given that he expressed concern that Thompson was still alive and presumably able to identify him. Clarke, 418

Mass. at 219, quoting Colon-Cruz, 408 Mass. at 545. Additionally, the jury could have concluded that Butler was attempting to frighten DaSilva and ensure that she did not speak to the police, given that she was one of only two people who could implicate him in the murder. See Commonwealth v. Beckett, 373 Mass. 329, 340 (1977) (one joint venturer making statement to encourage another not to speak to police supports finding that statement was made in furtherance of joint venture). DaSilva testified that she was in fact frightened by Butler's statements, that she delayed speaking honestly to the police due to her fear, and that she even considered committing suicide. Indeed, even after Butler and the defendant were arrested, they telephoned and spoke to DaSilva in an effort to keep her from speaking to the police. See note 14, supra. Simply put, the jury could have concluded that all of the statements were made in an attempt to conceal evidence of the joint venture, and thus that they fell well within the established exception to the hearsay rule.

c. Sleeping juror. The defendant next argues that the trial judge abused his discretion in allowing a ninety year old juror, whom other jurors believed had been sleeping, to remain on the jury. Where the judge conducted a thorough voir dire and determined that the juror was alert throughout the trial, we find no error. See Commonwealth v. Beneche, 458 Mass. 61, 78-79

(2010), quoting Commonwealth v. Brown, 364 Mass. 471, 476 (1973) (judge has discretion in what action to take when confronted with issue of sleeping juror, and burden is on defendant to show that judge's decision was "arbitrary or unreasonable"; burden not met where defense counsel twice opined that juror was sleeping and judge disagreed based on observations). See also Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 179-182 (2009) (defendant's burden not met where judge remarked that juror "keeps falling asleep" and called for recess to awaken juror).

d. Medical examiner's testimony. The defendant also argues that he was denied his right of confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights when the judge permitted a substitute medical examiner to testify as to facts contained in Tripp's autopsy report during his direct examination. Although the defendant is correct, there was no objection,[18] and we conclude that he suffered no prejudice from the error, and thus there was no substantial likelihood of a miscarriage of justice. See Commonwealth v. Emeny, 463 Mass. 138, 145-146 (2012).

---

[18] The defendant's argument that he objected to the testimony of the substitute medical examiner finds no support in the record. Counsel did not lodge an objection to the testimony as a whole, and only objected once on direct examination, in response to the prosecutor's question whether a forensic pathologist, armed with the information obtained in this case, could possibly determine the handedness of the killer.

At trial, the Commonwealth presented testimony from Dr. Richard Evans, a medical examiner and forensic pathologist for the Commonwealth. Evans testified that he did not perform Tripp's autopsy, but that it was instead conducted by Dr. Abraham Phillip. Shortly after completing the autopsy, Phillip left the medical examiner's office. Evans testified extensively as to Phillip's determinations and opinions as reflected in the autopsy report, including Phillip's observations as to the nature of the wound. Evans added that, on review of all of the documentation relative to the case, he determined that the cause of death was the incised wound to Tripp's neck.

As the Commonwealth correctly concedes, Evans should not have been permitted to testify as to the facts contained in the underlying autopsy report. See Commonwealth v. Nardi, 452 Mass. 379, 391-394 (2008) (testimony by substitute medical examiner as to facts and findings in original autopsy report is inadmissible hearsay). Nevertheless, there was no prejudice.

The improperly admitted testimony consisted of a recitation of Phillip's observations of Tripp's wounds, facts that were not in dispute. The defendant raised a third-party culprit defense; he did not argue that Tripp had not died from a knife wound to her throat, but that he had not slit her throat. In addition, the jury heard testimony from police and medical personnel who testified as to Tripp's wounds, and her medical records

detailing the fatal wound were properly admitted, rendering the erroneously admitted testimony cumulative. See Commonwealth v. Reavis, 465 Mass. 875, 884-885 (2013) (erroneously admitted testimony from substitute medical examiner created no substantial likelihood of miscarriage of justice where cumulative of other evidence). Simply put, the defendant was not prejudiced by the improper testimony about the wound that caused Tripp's death.

The defendant further argues that Dr. Evans improperly testified as to the time of death and the left- or right-handedness of the person who administered the wound. These claims are without merit. As an initial matter, Evans did not testify as to the time of death on direct examination. On cross-examination, defense counsel asked if the time of injury listed on the death certificate -- approximately 2 A.M. -- was based on any determination Evans had made. Evans responded that he made no actual determination regarding either the time of injury or the time of death based on his own observations, but instead relied on information he received from police. He added that, while the actual time of death was difficult to determine, Tripp likely died within minutes of the injury.[19,20] A surrogate

---

[19] Because Dr. Abraham Phillip left the medical examiner's office before completing the autopsy paperwork and death certificate for Tripp, Dr. Richard Evans completed and signed both documents based on a review of Phillip's notes and records.

examiner may "offer an expert opinion on the time that would have elapsed between injury and death" based on his or her "review of an autopsy report by the medical examiner who performed the autopsy." Reavis, 465 Mass. at 883. Thus, where Evans did not recite findings by Phillip regarding the time of death, but rather testified as to his own independent opinion, there was no error.

Similarly, and contrary to the defendant's assertions, Evans did not recite any of Phillip's findings regarding the handedness of the killer. Instead, he testified that, in his expert opinion, he could not testify to a reasonable degree of medical certainty as to the left- or right-handedness of the killer.[21] Again, it was proper for Evans to give his medical opinion based on "documents upon which experts are accustomed to rely, and which are potentially independently admissible through appropriate witnesses." Reavis, 465 Mass. at 883.

Even if Evans's testimony regarding the time of death and the handedness of the killer had been admitted erroneously, the defendant would not have been subject to a substantial likelihood of a miscarriage of justice. The time of death was,

---

[20] The death certificate reflects that Tripp was declared dead at 2:35 A.M.

[21] As both the defendant and Butler are left-handed, the defendant attempted to show that the killer was necessarily right-handed.

at best, collateral to his theory of defense, namely, that another person had committed the crime. Although the amount of time Tripp survived after the wound was relevant in considering whether the murder was committed with extreme atrocity or cruelty, Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983), the jury heard other evidence that she was alive when medical personnel arrived. Further, Evans's testimony did not harm the defendant, as he did not testify that the killer was necessarily left-handed. In fact, counsel for Butler extensively cross-examined Evans about the handedness of the killer, and counsel for the defendant argued in closing that Evans's testimony actually supported the theory that a left-handed person (which both the defendant and Butler claimed to be) could not have committed the murder. Thus, where the testimony was ambiguous, at worst, and helpful to the defendant, at best, there was no prejudice.

e. Prosecutor's closing argument. The defendant next argues that the judge committed reversible error in not granting a mistrial after the prosecutor argued in closing that Thompson said he "loved" Tripp. While the prosecutor's statement was unsupported by the evidence, we conclude that the error does not require reversal of the defendant's convictions.

Prior to closing arguments, counsel for Butler requested permission to argue that the evidence supported a fair inference

that the relationship between Thompson and Tripp had deteriorated, and that Tripp planned to leave Thompson, in an effort to support his theory that Thompson was responsible for her death.  The Commonwealth argued that the defense should be precluded from doing so.  The judge denied defense counsel permission to make the argument where evidence of the deteriorating relationship between Tripp and Thompson had been excluded from evidence.

During his closing argument, the prosecutor stated the following:  "The bottom line that you're going to have to ask yourself about Morris Thompson is what motive does he have to lie?  What motive does he have to continually come in here year after year, however many times he's given statements, to subject himself to hours of cross examination.  What motive?  Mr. Thompson, walking around completely mutilated for the rest of his life.  His eye is missing.  He's walking around with one eye and the remnants of a bullet in his head.  He watched his girlfriend, a woman who he said he loved, brutally murdered before his eyes, and they want you to believe that he's just protecting the real killers.  Are you kidding?"  (Emphasis added.)

Defense counsel for Butler objected to the prosecutor's statement and asked for an immediate curative instruction.  The judge took the request under advisement and dismissed the jury

for the day.  The next day, the judge told the prosecutor, "I wasn't too keen about the fact that you explicitly said [that Thompson loved Tripp]."  He added, "I think in the overall context of me trying to put the quash on that type of effort by the defense, it seems a little disingenuous for you to state it in the final argument."  He thus agreed to specifically instruct the jury to disregard the prosecutor's statement.[22]

The judge gave the curative instruction as part of his final charge to the jury.  He instructed them as follows:  "Also there was some statement that Morris Thompson loved Betsy Tripp.  Well, maybe he did and maybe he didn't, but there's no evidence of it, so you are to disregard, disregard that statement made by one of the attorneys in the course of the final argument.  And in any event, I stress, arguments are not evidence."  Defense counsel for Butler objected to the instruction, arguing, "When you said 'maybe he did, maybe he didn't,' I think that dilutes the importance of telling the jury, you can't consider that, it was improper.  Because I want it stricken from memory as best we

---

[22] The judge noted, "I know also in the overall context of the case it may be minor . . . but I do think that [defense counsel] is correct in that I should tell the jury to disregard that.  Now it's a matter of degree.  [Defense counsel] would perhaps prefer the strongest possible corrective, which I don't think is necessarily called for.  But I do think that the defendants are correct in asking me to draw the jurors' attention to it and to tell them to disregard it . . . ."

can."  The judge subsequently denied Butler's counsel's motion
for a mistrial.

On review of the entire transcript, we agree that Thompson
did not expressly testify that he "loved" Tripp.[23]  We agree with
the judge's assessment that the statement was made in error, a
point that the Commonwealth concedes.  In determining whether
such an error requires reversal, we consider "(1) whether the
defendant seasonably objected; (2) whether the error was limited
to collateral issues or went to the heart of the case; (3) what
specific or general instructions the judge gave to the jury
which may have mitigated the mistake; and (4) whether the error,
in the circumstances, possibly made a difference in the jury's
conclusion."  Commonwealth v. Lewis, 465 Mass. 119, 130-131
(2013), quoting Commonwealth v. Kater, 432 Mass. 404, 422-423
(2000).  Where, as here, the error is properly objected to, we
review the entire record to determine "whether the error was
prejudicial to the point of requiring a reversal of the
conviction."  Commonwealth v. Kozec, 399 Mass. 514, 523 (1987).

---

[23] Thompson did testify that he dated Tripp for eight years
and lived with her for seven.  He referred to her as a "lovely
lady" and "my girl," and became visibly emotional when shown her
picture.  Counsel in closing "may argue fair inferences that
might be drawn from the evidence," Commonwealth v. Murchison,
418 Mass. 58, 59 (1994), and it may indeed be a fair inference
that Thompson loved Tripp.  However, the prosecutor did not
argue that Thompson loved Tripp, but that Thompson said that he
loved her.  Thompson did not testify as such, despite ample
opportunities to do so over the course of his lengthy testimony.
The statement was therefore error.

See Commonwealth v. Yesilciman, 406 Mass. 736, 746 (1990). We conclude that the judge's specific curative instruction regarding the statement was adequate to prevent any risk of prejudice. He explicitly told the jury that it had been argued that Thompson loved Tripp, that there was no such testimony given, and that the statement should be ignored. He then stressed that closing arguments are not evidence. The jury are presumed to have followed the judge's instructions, Commonwealth v. Sylvia, 456 Mass. 182, 195 (2010), and specific curative instructions are ordinarily sufficient to cure any misstatements. See Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 232 (1992); Commonwealth v. Palmariello, 392 Mass. 126, 133 (1984).

In addition, we cannot say that the error, taken in context, made a difference in the jury's conclusion. It was a single statement made in the course of a lengthy closing argument. The prosecutor was attempting to rebut defense counsel's argument that Thompson was not credible and was motivated to lie to protect himself or the third-party killer. The prosecutor properly responded by pointing out that Thompson had no motive to lie and that he was nearly killed in the same assault. To be sure, he should have avoided comment on the nature of the relationship between Thompson and Tripp, particularly where he had moved to exclude reference to their

relationship during the defendant's closing argument.  However, Thompson was exhaustively cross-examined, and defense counsel ably challenged his credibility throughout the trial.  Thus, the jury's determination on the issue of Thompson's credibility was not likely to have been swayed by an isolated use of the word "loved" in closing.  See Commonwealth v. Gomes, 443 Mass. 502, 510 (2005) (prosecutor's isolated slip of tongue harmless beyond reasonable doubt because of strength of Commonwealth's case and judge's instruction that closing statements are not evidence).

f.  Purportedly perjured testimony of Thompson and DaSilva. The defendant argues that the judge erroneously denied his motion to dismiss the indictments against him because they were obtained through perjured grand jury testimony from Thompson and DaSilva.  We find no error.

Prior to trial, counsel for Butler filed a "motion to dismiss the indictments or to provide alternative relief at the fourth retrial of this matter."  Counsel for the defendant joined in the motion.  The defense collectively argued that Thompson and DaSilva had made inconsistent statements throughout their testimony in the three prior trials, and that Thompson specifically committed perjury before the grand jury when he denied that he was a drug user, a fact that was contradicted by the testimony of several other witnesses at both the grand jury and the prior trials.  They contended, "[I]t is beyond question

that Morris Thompson is a liar and a perjurer and his testimony is therefore unreliable and cannot be used at trial." They argued the same regarding DaSilva's testimony.

For these reasons, the defense asked the judge to dismiss the indictments as obtained through perjury. In the alternative, they asked the judge to (1) require the Commonwealth to provide to defense counsel all statements by Thompson and DaSilva it knew to be false; (2) require that the Commonwealth provide notice of any statements it intended to introduce that were inconsistent with statements made at previous trials; and (3) allow the defendant to impeach Thompson and DaSilva with inconsistent statements concerning substance abuse and prior bad acts. The judge denied the motion.

As a general rule, "a court should not inquire into the adequacy or competency of the evidence upon which an indictment is based." Commonwealth v. Salman, 387 Mass. 160, 166 (1982). However, if "it appears that the integrity of the grand jury process has been impaired, a defendant may attack the validity of the indictment by way of a motion to dismiss." Id. It is undisputed that "the knowing use by the Commonwealth or one of its agents of false testimony to procure an indictment is a ground for dismissing the indictment." Id.

When arguing that a prosecutor knowingly presented false testimony to a grand jury, "[t]he defendant bears the heavy

burden of proving that '(1) the evidence was given to the grand jury knowingly or with a reckless disregard for the truth and for the purpose of obtaining an indictment, and (2) that the evidence probably influenced the grand jury's determination to indict the defendant.'" Commonwealth v. Collado, 426 Mass. 675, 680 (1998), quoting Commonwealth v. Kelcourse, 404 Mass. 466, 468 (1989). The defendant has not met his burden here.

Although the defendant denied being a crack cocaine user before the grand jury, the prosecutor elicited contradictory testimony at the grand jury from another witness indicating that Thompson had, in fact, used cocaine the night of the murder. Thus, the prosecutor did not attempt to secure an indictment by leaving the jury with the impression that Thompson had not used drugs that night. See Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986).

Further, while Thompson and DaSilva both changed their testimony in some respects at trial, the defendant overstates the extent of their inconsistencies. Both at the grand jury and at trial, Thompson's version of the most important facts was essentially the same. Without fail, he consistently testified that he went to DaSilva's home on the night of the murder; that Butler produced a silver gun, robbed him, and ordered him to his automobile along with the defendant; that Butler and the defendant used a telephone wire to tie up him and Tripp; that

Tripp gave the defendant her ATM card and PIN; that Butler stayed behind while the defendant attempted to withdraw money; that the defendant slit Tripp's throat when he was unable to withdraw any significant amount of money; and that Butler shot him in the head when he tried to go to Tripp's aid.

Similarly, DaSilva always testified that Thompson went to her apartment on the night of the murder; that Butler pulled out a silver gun and left with Thompson and the defendant; that Butler and the defendant returned to the apartment later, took off their clothes, and put them in a plastic bag; that blood appeared to be on a pair of gloves they had; that she spoke to Butler while she was in the bathroom; that Butler told her he had slit Tripp's throat because there was no money in her account; and that he told her that the defendant shot Thompson when he attempted to help Tripp.

While the defendant correctly points out a number of differences between the testimony of Thompson and DaSilva given before the grand jury and in their testimony in the later trials, "[p]resentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury." Commonwealth v. McLeod, 394 Mass. 727, 743-744, cert. denied sub nom. Aiello v. Massachusetts, 474 U.S. 919 (1985), quoting United States v. Holladay, 566 F.2d 1018, 1019 (5th Cir. 1978). Given that both witnesses' versions of the core facts of

the case remained essentially the same at all proceedings, and given that their testimony corroborated each other's stories, the prosecutor did not knowingly elicit perjury. See Commonwealth v. Miranda, 458 Mass. 100, 111 (2010), cert. denied, 132 S. Ct. 548 (2011) (no indication that prosecutor elicited perjured testimony where "there were some inconsistencies" between testimony from two witnesses but "many details corroborated each other").

Just as importantly, the defendant has not met his burden of showing that Thompson's testimony that he did not use crack cocaine on the night of the murder "probably influenced the grand jury's determination to indict the defendant." Collado, 426 Mass. at 680, quoting Kelcourse, 404 Mass. at 468. The core issue before the grand jury was simply whether the defendant and Butler murdered Tripp. Where the grand jury heard substantial evidence regarding the defendant's participation in the murder presented before the grand jury, it is highly unlikely that the issue of Thompson's drug use had any impact on the jury's decision to indict the defendant, especially where evidence was presented suggesting that he had, in fact, used crack cocaine that night. See Commonwealth v. Rice, 441 Mass. 291, 310 (2004).

We also find no merit to the defendant's contention that the judge should have allowed his motion for alternative relief.

The defense, having tried the case three times, was fully aware of the witnesses' inconsistencies prior to trial.[24]  The defendant's due process rights were not violated where the facts that went to the heart of the case remained essentially unchanged throughout the trials.  Further, the defense extensively and effectively cross-examined both witnesses regarding their inconsistencies, and counsel for both defendants adequately argued against Thompson and DaSilva's credibility in closing.  Commonwealth v. Gagliardi, 29 Mass. App. Ct. 225, 236 n.9 (1990) ("Even if the Commonwealth was obligated to inform the defendant of [any] changes" in testimony, failure to do so not prejudicial where counsel "effectively cross-examined both witnesses").  Thus, the judge did not err in denying the defendant's motion.

g.  Press release.  After closing arguments, but before the final jury charge was given, defense counsel informed the court that the Suffolk County district attorney's office had issued a press release on its Web site the previous night regarding the case.[25]  The press release summarized the facts of the case and

---

[24] The Commonwealth also provided defense counsel with new statements made by Thompson and DaSilva prior to trial.

[25] The trial prosecutor stated that he had not seen the press release, and there is no reason to believe that he was involved in the decision to publish it.  However, the Commonwealth is responsible for the conduct of all of the employees in the Suffolk County district attorney's office, so

quoted the prosecutor's closing argument.  Of particular relevance, the press release noted that the trial was the fourth for both defendants.  It stated that "[t]he first proceedings ended in an [eleven] to one impasse, with jurors favoring conviction; the second trial ended abruptly when the presiding judge took ill; and the third ended in another hung jury, this one favoring conviction [ten] to two."  Press Release, Suffolk County District Attorney's Office, 4th Trial Ends for Duo Accused of Brutal Murder, Attempt (June 2, 2009).

The prosecutor then informed the judge that an article about the case had been published in the daily Metro newspaper that morning.  Similar to the press release, the article referenced the fact that the trial was the fourth for the defendants, and noted the vote counts of the prior juries.  It also summarized the facts and quoted closing arguments for both the prosecutor and the defense.

The judge proceeded to ask the jury whether they had read anything about the case in the media.  Three jurors -- jurors nos. 6, 4, and 1 -- all answered in the affirmative, and the judge conducted an individual voir dire of each of them.  Juror no. 6 explained that he had read the article, and that it "said that closing arguments occurred, it had a few quotes from

---

the prosecutor's lack of involvement does not bear on our analysis of the conduct.

closing arguments, and that basically it was the fourth trial." Juror no. 4 said that she had simply scanned the article, and stated that it included "[n]othing [she] didn't know."  Juror no. 1 stated that she did not read the text of the story, and only saw the headline, which contained no information about the existence of prior trials or their vote counts.  None of the jurors stated that he or she had taken note of the prior vote counts, and all three averred that they could remain impartial.  Immediately following this voir dire, neither defense attorney objected or asked for a mistrial, and counsel for the defendant simply asked for an instruction that the jury not read anything about the case in the media.  Later that day, following the final jury charge, counsel for Butler, joined by counsel for the defendant, moved for a mistrial upon their discovery that the article referenced the vote counts of the prior juries, and the judge denied their motion.  Significantly, and fortunately for the Commonwealth, jurors nos. 6 and 4 were ultimately designated as alternate jurors, and did not participate in deliberations.

The defendant now contends that the district attorney's office's decision to issue the press release constituted egregious government misconduct necessitating reversal. "Dismissal of criminal charges . . . is the most severe sanction that the court can impose in a criminal case to remedy misconduct on the part of the Commonwealth."  Commonwealth v.

Mason, 453 Mass. 873, 877 (2009).  Such relief should be reserved for "only the most intolerable government conduct." Commonwealth v. Monteagudo, 427 Mass. 484, 485 n.1 (1998), quoting United States v. Restrepo, 930 F.2d 705, 712 (9th Cir. 1991).  However, "[w]e have delineated limited circumstances for dismissing a complaint due to prosecutorial misconduct:  . . . if the 'governmental conduct resulted in such irremediable harm that a fair trial of the complaint or indictment is no longer possible' . . . and where the prosecutor's conduct is otherwise so egregious that dismissal is warranted to deter similar future misconduct" (citations omitted).  Commonwealth v. Merry, 453 Mass. 653, 665-666 (2009).  See Oregon v. Kennedy, 456 U.S. 667, 676 (1982).

We conclude that the Commonwealth's actions were egregious. While the jurors were likely aware that there had been previous trials, due to the amount of time that had passed since the murder and the innumerable references to prior proceedings, the press release contained vote counts that showed that two prior juries strongly favored conviction.  It also presented the facts of the case in sensationalized terms[26] that exclusively favored the Commonwealth's theory of the case.  Had the press release

---

[26] For example, the press release discussed Tripp's "horrific death" in the course of a "brutal murder," and cited the prosecutor's statement that Tripp's "life literally drained out of her body."

been seen by any of the jurors, it easily could have caused a substantial likelihood of a miscarriage of justice by informing them that twenty-one of the twenty-four jurors who had previously heard the evidence believed the defendant and Butler to be guilty.

The Commonwealth's contentions are unavailing. First, although the information in the press release had been in the public domain, the Commonwealth knew, or should have known, that the jurors would not likely seek out such information, and that the breakdown of the prior vote counts was highly prejudicial. Additionally, the Commonwealth's argument that there is no evidence that the press release was the basis for the article strains credulity, where it was published the morning after the press release was issued and referenced the prior vote counts. In any event, even if the press release had not been the basis for the article, the Commonwealth should have known that the press release contained prejudicial information that it made available for use by the media at a critical moment in the trial, and thus its decision to issue the press release was, at best, gross negligence.

However, our examination does not end with a determination that the Commonwealth's conduct was egregious. The defendant is entitled to dismissal only where the conduct in question was of "sufficient significance to result in the denial of the

defendant's right to a fair trial." Commonwealth v. Dabrieo,
370 Mass. 728, 743 (1976), quoting United States v. Agurs, 427
U.S. 97, 108 (1975).  Here, the judge conducted a thorough voir
dire and determined that only three jurors had seen the article.
Of those jurors, only one took part in deliberations, and she
had read only the headline, which contained no potentially
prejudicial information.  We cannot say that the judge abused
his discretion in determining that the jurors had not been
"contaminated by extraneous information."  Commonwealth v.
Jackson, 391 Mass. 749, 756 (1984).[27]

   h.  Inconsistent verdicts.  The Commonwealth proceeded at
trial under the theory that the defendant and Butler were liable
as joint venturers for the death of Tripp in a botched robbery.
Accordingly, the judge instructed the jury as to the elements of
joint venture liability.  The defendant was convicted of murder
in the first degree based on the theories of extreme atrocity or
cruelty and felony-murder, and Butler was convicted of murder in
the second degree on the theory of felony-murder.  The defendant
argues that the verdicts were inconsistent.

   "That breed of 'inconsistent' verdicts which is not allowed
to stand under our cases is small . . . ."  Commonwealth v.

_____

   [27] Our conclusion that the defendant was not deprived of a
fair trial and that the trial judge did not abuse his discretion
in the circumstances might have been different had jurors nos. 6
and 4, who served as alternate jurors, taken part in the
deliberations.

Scott, 355 Mass. 471, 475 (1969).  "We have applied the so-called 'rule of consistency' to reverse convictions only where three elements are present:  'a crime charged that by its nature requires a combination of individuals; a single trial of all the participants in the crime; and an acquittal of all but one of the participants.'"  Commonwealth v. Fluellen, 456 Mass. 517, 520 (2010), quoting Commonwealth v. Medeiros, 456 Mass. 52, 59 (2010).  Here, the first and third requirements are not met, and thus the defendant's argument fails.

"We have not applied the rule of consistency to inconsistent verdicts in joint venture trials (as we have to those in conspiracy trials), because the first element, a crime that requires a combination of individuals, is generally not satisfied."  Fluellen, 456 Mass. at 520-521.  See Medeiros, 456 Mass. at 59-60 (crime requiring combination of individuals must be defined by "united act" of two or more individuals, where such united act is element of crime charged).  While joint venture liability requires a combination of individuals, it is not an underlying crime.  The underlying crime here is murder, which does not "by its nature require[] a combination of individuals."  Moreover, the defendant cannot meet the third requirement, which necessitates an acquittal of all but one of the defendants.  Although Butler was convicted of a lesser offense, he was still found guilty of murdering Tripp.

In any event, "inconsistent verdicts for joint venturers tried together does not undermine our deference to juries." Fluellen, 456 Mass. at 523. We generally tolerate inconsistent verdicts "because of the jury's inherent power to indulge their compassion and to enter into compromises." Id. See Scott, 355 Mass. at 475. Although the defendant contends that the verdicts in this case "make[] no sense," there was sufficient evidence to prove that the defendant, and not Butler, fetched a knife from the kitchen and slit Tripp's throat. The jury acted well within their discretion in deciding to hold the defendant responsible to a greater degree than Butler.

i. Jury questions. The defendant also argues that the judge improperly answered two questions from the jury regarding joint venture liability. "The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly." Commonwealth v. Delacruz, 463 Mass. 504, 518 (2012), quoting Commonwealth v. Bell, 455 Mass. 408, 420 (2009).

During the sixth day of deliberations, the judge received two questions from the jury. The first asked: "If the jury find[] that there was a joint venture in the commission of a murder, can the degree of murder differ between the principal and the joint venturer?" The second asked: "If there is a

finding of joint venture, can the theories of murder differ between the principal and the joint venturer?" After a lengthy discussion with counsel, the judge answered both questions in the affirmative, over objection from the defendant. We conclude that the judge's answers were not erroneous in the circumstances, based on the evidence before the jury in this case.[28]

The jury were required first to determine whether the defendant and Butler participated in the kidnapping, robbery, murder, and shooting alleged in this case. Both the defendant and Butler testified that they had no involvement in the crimes and were not present when they occurred. Thompson testified to the opposite, and identified the defendant as the person who murdered Tripp when the robbery was unsuccessful and Butler as the person who shot him. If the jury rejected the testimony of the defendant and Butler as to their noninvolvement in the crimes, which the jury plainly did, the jury were confronted with conflicting testimony as to which of the two committed which of the felonious acts and, ultimately, the degree of culpability that the jury would assign to their conduct. In these circumstances, it was proper for the jury to consider the defendant and Butler as joint venturers, knowingly participating

---

[28] We need not decide whether the proposition of law drawn from the jury's questions and the judge's affirmative responses regarding joint venture liability would be correct in all cases.

in the commission of some or all of the several crimes charged, but assigning a different level of culpability in the resulting murder, so long as the defendant and Butler each had, at a minimum, the required intent for the crimes of which they were convicted.  Thus, the jury could, in the exercise of their discretion, permissibly find the defendant and Butler guilty of a different degree of murder, even based on different theories.

The jury found Butler guilty, and the defendant not guilty, of assault and battery by means of a dangerous weapon (a firearm) on Thompson.  Taken in context, it is clear that the jury credited Thompson's account of the events:  that the defendant slit Tripp's throat and Butler shot Thompson.  Thus, it is apparent that they intended to find the defendant guilty of murder in the first degree under at least the theory of extreme atrocity or cruelty, and were merely attempting to determine whether they could hold Butler responsible to a lesser degree or under a different theory.

The defendant essentially seems to argue that, if he and Butler were both found guilty of armed robbery as joint venturers -- a predicate felony for felony-murder in the first degree -- Butler should also have been convicted of murder in the first degree.  To be sure, the jury could have so found.  However, the jury have the inherent power to enter into compromises in reaching their verdict.  Fluellen, 456 Mass. at

523. The verdict here does not indicate that the jury were confused, but rather that they entered into a compromise in finding Butler guilty of murder in the second degree where they believed that the defendant, and not Butler, slit Tripp's throat. Regardless of the correctness of the judge's answers to the questions, the defendant was not prejudiced by the jury's conscious decision to hold Butler responsible to a lesser degree than they were legally permitted to.[29]

j. General Laws c. 278, § 33E. We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. We find no such reason, and we decline to exercise our powers under the statute. We therefore affirm the defendant's convictions. We also reinstate the defendant's two convictions of armed robbery, which the trial judge had dismissed as the felonies underlying the felony-murder conviction and therefore duplicative. The case is therefore

---

[29] The defendant also briefly argues that the absence of special verdict slips requiring unanimity as to joint venture or principal liability confused the jury. To the contrary, we have held that permitting general verdict slips is preferable in order to mitigate confusion attached to the "false distinction" between principal liability and joint venture liability. Commonwealth v. Zanetti, 454 Mass. 449, 464, 466-467 (2009). Again, where the jury appear to have entered into a compromise regarding Butler's liability, there was no likelihood of confusion and no prejudice suffered by the defendant.

remanded to the Superior Court for sentencing on these two reinstated convictions.

<u>So ordered</u>.