## COMMONWEALTH *vs.* EDWIN MEJIA.

Suffolk. November 10, 2011. - August 21, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury.

During closing argument at a murder trial, the prosecutor did not improperly comment on the defendant's credibility in referring to the defendant's responses to questions posed in prearrest exchanges, and although references to the defendant's denials of guilt, made during a recorded custodial interrogation after the defendant had been informed of his Miranda rights, was error, no substantial likelihood of a miscarriage of justice arose, where the accusations to which the defendant responded were cumulative of other evidence, the officer making the accusation was available for cross-examination, and the playing of the recording of the defendant's responses allowed the jury to hear his prompt and emphatic denials without his having to testify, and where it was the defendant who moved for the admission of the recorded statement [250-253]; further, although the prosecutor's references to the victim unduly emphasized the loss suffered by her family and were better left unsaid, the remarks did not give rise to prejudicial error requiring reversal, where the judge instructed the jury on the first day of trial and in the final charge not to deal with the case from a position of sympathy or compassion, the prosecutor himself urged the jury to decide the case on the evidence in his closing, and the Commonwealth's case was strong [253-254]; finally, the prosecutor did not engage in improper vouching [254], and an argument for conviction fell into the category of permissible rhetoric [255].

At a murder trial, the judge did not err in instructing the jury on reasonable doubt, where the instruction was an accurate statement that the Commonwealth need not exclude every other hypothesis to the effect that a person or persons other than the defendant committed the offense, and where the language the judge used did not confuse the jury with respect to the Commonwealth's burden of proof. [255-257]

This court declined to exercise its power under G. L. c. 278, § 33E, to reverse a conviction of murder in the first degree on theories of felony-murder and extreme atrocity or cruelty or to reduce the conviction to a lesser degree of guilt. [257]

INDICTMENTS found and returned in the Superior Court Department on August 18, 2005.

The cases were tried before *Patrick J. Riley,* J.

*Robert S. Sinsheimer* for the defendant.

*Macy Lee*, Assistant District Attorney (*John P. Pappas*, Assistant District Attorney, with her) for the Commonwealth.

DUFFLY, J. On the morning of June 11, 2005, the body of Lourdes Hernandez was discovered inside the retail gasoline station and convenience store (mini-mart) where she was employed as a cashier. Hernandez had been stabbed multiple times, and approximately $2,300 was missing from the store. The defendant, who months earlier had been fired from his job at the mini-mart, was convicted of murder in the first degree, G. L. c. 265, § 1, on theories of felony-murder and extreme atrocity or cruelty, and of armed robbery, G. L. c. 265, § 17.[1] The defendant claims on appeal that inappropriate statements made in the prosecutor's closing argument, and a defective jury instruction on reasonable doubt, constituted error requiring that his conviction be reversed. He also claims that a new trial is warranted under G. L. c. 278, § 33E. For the reasons that follow, we affirm the conviction and decline to exercise our extraordinary power under G. L. c. 278, § 33E.

*Background.* A jury could have found the following facts from the evidence at trial. Beginning in 2001, the defendant was employed as a cashier at the mini-mart, which is located in the Dorchester section of Boston. In November, 2004, he was fired for chronic tardiness. At the time, the defendant expressed anger at being fired to his girl friend, Vanessa Pineda, and told her that he would one day rob the mini-mart; he thereafter repeated his intention to rob the mini-mart on multiple occasions.

On the afternoon of Thursday, June 9, 2005, the defendant directed that Pineda write a note to her sister, Leann Garcia, stating that he and Pineda sought a favor, for which Garcia would be "generously compensated in the amount of $1,000."[2]

---

[1] The defendant was found not guilty of murder in the first degree on an alternate theory of deliberate premeditation. The armed robbery conviction was dismissed as duplicative. Before trial, the Commonwealth filed a nolle prosequi as to indictments charging assault with intent to rape, G. L. c. 265, § 24, and larceny of a motor vehicle, G. L. c. 266, § 28 (*a*).

[2] The note, which was admitted in evidence, was dated June 9, 2005, and read in its entirety:

"Lee,

"Me and Edwin have a favor to ask from you which will be fully + gener-

The defendant and Pineda traveled to Garcia's home in Chelsea, where the defendant left the note for Garcia to find. Later that night, Garcia visited the defendant and Pineda at the apartment in Everett that they shared with Pineda's two young children, the defendant's mother, and his mother's boy friend. The defendant told Garcia that he and Pineda intended to rob the mini-mart that Saturday, June 11, and he requested that she assist as their driver. He outlined the following plan. The trio would be at the mini-mart at 6 A.M., when the defendant expected that Adalgisa Vila, the assistant manager, would arrive. Because the defendant's voice would be recognizable, Pineda would do the talking while one of them stood behind Vila, holding a knife to her throat; they would then force Vila into the building and make her hand over cash receipts that were kept in a safe. The defendant said the safe would be full on a Saturday and expressed confidence that Vila would cooperate. He stated that, if she resisted, he would scare her by stabbing her "a little bit."

The conversation lasted approximately one-half hour and ended with Garcia and Pineda each expressing doubts about the soundness of the defendant's plan, and Garcia refusing to provide assistance. The defendant said he would delay executing his plan. The next day, June 10, Pineda pressed the defendant to abandon the plan altogether, and he told her he would not follow through with it.

Although Vila had been scheduled to open the mini-mart on June 11, she made plans to go out of town, so Hernandez covered Vila's shift that day. Starting at 7 A.M. that morning, several customers saw that the mini-mart was open and observed Hernandez both inside and outside near her automobile. Shortly before 9 A.M., a regular customer, who recognized the defendant as a former employee of the mini-mart, saw him enter the building through an employees-only side door that provided access to

ously compensated in the amount of $1,000.00 (cash). Stop by the house ASAP. This favor will only take about 1 ½ hours. (No it does not involve babysitting.) Do not tell *anyone*.

"[Love], Nessa.

"P.S. I was supposed to be on a plane right now. Shhh! Ma bought me tickets but I will pay her back on Sat[urday]." (Emphasis in original.)

the cashier's work area and office;[3] another regular customer, who also recognized the defendant as a former employee, noticed him talking with Hernandez in the cashier's area around the same time. At approximately 9:15 A.M., a passerby saw that the metal security grates located outside the building were up, and the mini-mart appeared to be open for business.

Driving by at approximately 10 A.M., the store manager, Hilda Rodriguez, observed that the security grates were lowered and that Hernandez's automobile was not parked outside. Rodriguez tried unsuccessfully to reach Hernandez by calling her cellular telephone; she then drove to Hernandez's apartment but saw no sign there of Hernandez or her vehicle. Returning to the mini-mart, Rodriguez entered through the employees-only side door and discovered Hernandez's body on the floor of the employees' office. The body was on its back, the upper part lying in a pool of blood; a white plastic bag had been placed over her head and tightly secured, and two cases of juice were stacked on top of the plastic bag.[4] Hernandez's jeans and underwear were bunched around her right ankle. An autopsy revealed that Hernandez had been stabbed around the face, upper chest, and neck area multiple times, and that she had suffered additional stab wounds, contu-

[3]The portion of the retail gasoline station and convenience store (mini-mart) to which customers had access consisted only of a small vestibule, entered through doors in the front of the building. The vestibule was separated from the rest of the store's interior by plexiglass, through which customers could see items available for purchase. The cashier, who entered the mini-mart through an employees-only side door and was stationed behind the plexiglass, conducted transactions through a small window. The cashier had access to an office and a bathroom located in the employees-only area. That area also contained two safes, one of which held cash receipts from sales of gasoline and merchandise. The cashier periodically deposited receipts in that safe through a hole located in its top; the safe could only be opened by the store manager, Hilda Rodriguez, and the assistant manager, Adalgisa Vila. Also in the employees-only area were equipment that controlled the metal security grates, security monitors, and a video-recording system, see note 5, infra.

[4]The police investigation included forensic analysis of several areas and items in the mini-mart. A fingerprint expert testified that there was evidence only of "smudges and smears" but stated that the absence of "actual friction ridge skin on those items . . . does not indicate they weren't handled." No prints were found on Hernandez's body. The expert testified that a person wearing a leather glove "wouldn't leave a print." A second expert testified that the defendant could not have been a contributor to deoxyribonucleic acid (DNA) in blood samples taken from the scene.

sions, and abrasions to other parts of her body. According to the medical examiner, any one of three stab wounds would have been fatal. A total of $2,303 in cash, including approximately $200 in coins, had been taken from the mini-mart. Hernandez's vehicle was recovered in the early morning hours of June 12 in the Roxbury section of Boston, some distance from the mini-mart but less than a mile from a Massachusetts Bay Transportation Authority (MBTA) subway station on Massachusetts Avenue.[5]

When Pineda awoke at 8:30 A.M. on June 11, the defendant was not at home. She telephoned the mini-mart at 10 A.M., but there was no answer. Approximately one hour later, the defendant telephoned Pineda at their apartment from a pay telephone at the MBTA subway station on Massachusetts Avenue, told her that he "got the money," and urged her to "just stay cool"; he called again minutes later and repeated this message. Shortly before noon, the defendant returned to the apartment. He was carrying a bag that contained approximately $2,100 in cash; $200 in wrapped coins; a video cassette labeled "Tuesday"; a pair of leather gloves; and a knife handle without a blade, which Pineda recognized as belonging to a set of knives owned by the defendant's mother. The defendant told Pineda that he had robbed the mini-mart with the help of an unnamed person, with whom he had split the proceeds, and that the cashier was not the woman he had expected to be working that day. When Pineda asked what they had done to her, the defendant replied that they had beaten her "just a little bit," and that she would "just need some ice."

The defendant asked Pineda to wash the clothes that he was wearing; when he removed his shirt, Pineda could see "injuries" on his chest and arms, and the defendant showed her a cut on his thumb, which he said was the result of Hernandez biting him. While the defendant showered, Pineda went to the base-

[5]The mini-mart had a video surveillance system consisting of a camera, a tape recorder, and several tapes, which were used on a rotating basis to record surveillance footage. One of those tapes, labeled "Tuesday," was among the items taken from the store. The surveillance system was not working that day. The jury reasonably could have inferred that in order to avoid detection, the perpetrator had retrieved the tape from the tape recorder, not knowing that it was not operational.

ment laundry and washed his clothes. She saw what appeared to be a drop of blood on the bottom of one pant leg, and that the defendant's black shirt was wet.[6]

Sometime between noon and 1 P.M., the defendant, Pineda, and Pineda's infant daughter left the apartment. They traveled to a supermarket, where they deposited the stolen coins in a coin-counting machine, and wired $200 to Pineda's mother in Florida.[7] They also purchased a membership at a tanning salon for Pineda and ate lunch at a nearby restaurant. Pineda discarded the video cassette in a wastebasket in the restaurant bathroom, and the defendant disposed of the knife handle by tossing it down a sewer located outside the restaurant. Pineda and the defendant later traveled by subway to a shopping area in downtown Boston, where they made a number of purchases at clothing boutiques, making all payments in cash. The defendant, who had been wearing sandals when he arrived home from the mini-mart, purchased a new pair; Pineda put the defendant's old sandals in the box from that purchase and left it on a sidewalk.

The Boston police initially talked to the defendant at his apartment on June 14, after Rodriguez had given them a list of former employees of the mini-mart. At that point, police had not interviewed any witnesses who placed the defendant at the scene. During the interview, the defendant stated that he had once worked at the mini-mart but had quit in November, 2004, had moved to Florida, and had not been back to the mini-mart since that date. He claimed that on June 11, he and Pineda left their apartment at 9 A.M., dropped her daughter off at day care, and spent most of the day shopping in Boston, returning to the apartment between 5 and 6 P.M. Without prompting, the defendant offered that Pineda was earning "good money" as a waitress at a nearby restaurant.[8] He also showed police a cut on his

---

[6] Later in the week, after being interviewed by police, the defendant attempted to burn these clothes in a tub in the basement. At the defendant's request, Pineda disposed of the burnt remnants in a neighbor's garbage.

[7] Pineda testified under a cooperation agreement with the Commonwealth. The timing of many of the defendant's activities on the day of the murder, about which Pineda testified, were corroborated through telephone records, a picture obtained from the supermarket's security camera, and the testimony of other witnesses.

[8] Testimony from Pineda and her former manager revealed that she was not

thumb, which he said he had received while removing carpeting from the apartment on June 10. According to the defendant, he did not learn about the robbery and murder until the day after they occurred. Before the interview ended, the defendant acknowledged that he had been fired from his job, rather than quitting.

On June 16, Garcia contacted the Chelsea police, after the defendant had interrupted a telephone conversation between Garcia and Pineda and accused Garcia of telling police about his plan to rob the market. During an interview with Boston police detectives in the early morning hours of June 17, she turned over the note that the defendant had left at her apartment on June 9. On June 17, police also interviewed a regular customer of the mini-mart, who identified the defendant as a former employee whom he had seen standing with Hernandez on the morning she was murdered, and staff at the restaurant where Pineda had worked, from whom police learned that she had not worked there since June 3. Later that day, the defendant and Pineda were arrested. The defendant requested, and was provided, a Spanish language interpreter. After Miranda warnings were administered in Spanish and acknowledged by the defendant, both orally and in writing, he made a statement that was tape recorded. A copy of the recording was admitted in evidence during the Commonwealth's case-in-chief at the request of the defendant, who argued for its admission over the Commonwealth's objection.

The defendant did not testify at trial but relied on his tape-recorded statement to police to put before the jury his denials that he was at the mini-mart and that he committed the robbery and murder. The sole defense witness was his mother's former boy friend, who testified that he had seen the defendant at their apartment around 9:40 A.M. on the morning of the murder. The thrust of the defendant's argument to the jury was that, given the absence of forensic evidence establishing his presence at the scene of the crime, the police investigation was incomplete and failed to exclude other possible perpetrators.

employed on June 14. Her employment at the restaurant had ended after she took home several hundred dollars' worth of receipts following her shift on June 3. When Pineda's former manager attempted to contact her on June 4 by telephoning the apartment, the defendant falsely told him that Pineda had flown to Florida on the night of June 3.

*Discussion.* 1. *Prosecutor's closing argument.* The defendant objected to a number of statements in the prosecutor's closing argument and moved for a mistrial. The judge overruled the objections and denied the motion. The defendant maintains that the prosecutor improperly commented on the defendant's credibility and offered his own opinion as to the veracity of the Commonwealth's case; made comments that appealed to the jury's sympathy; unduly emphasized the gruesome nature of the killing; and concluded with an improper rhetorical flourish. He argues that these errors were prejudicial and require that his conviction be reversed.

Where a defendant challenges statements in the Commonwealth's closing argument, "the standard for determining whether a conviction must be reversed . . . is whether [any] improper statements made by the prosecutor 'constituted prejudicial error.' " *Commonwealth* v. *Rosario*, 430 Mass. 505, 515 (1999), quoting *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993). In making that determination, we consider the prosecutor's remarks "in the context of the entire argument, the testimony, and the judge's instruction to the jury." *Commonwealth* v. *Hrabak*, 440 Mass. 650, 654 (2004), and cases cited.[9] In the circumstances here, there was no error requiring reversal of the defendant's conviction.

a. *Comments on defendant's credibility.* At trial, the defendant objected to the prosecutor's "repeated references" to his lack of credibility, which he argued were tantamount to impermissible comments on his failure to testify. On appeal, he claims that the Commonwealth was not entitled to comment on his credibility in general, because he chose not to testify, or in particular on the veracity of statements he made during noncustodial police questioning, because he subsequently repeated those statements during a postarrest interview that, the defendant argues, was erroneously admitted in evidence.

The defendant identifies four comments in the prosecutor's

---

[9] The jury charge contained complete instructions on the role of opening and closing argument. After concluding the instruction, the judge reiterated, "You may consider only the evidence properly admitted in this case. The evidence in the case consists of the sworn testimony of the witnesses and the exhibits received into evidence."

argument that he claims gave rise to error. Two of the challenged comments — "[T]his defendant took liberty with the truth," and "[H]e stretches the truth" — referred to the defendant's false statement to Pineda's former manager on June 4 that Pineda had left the State. The remaining comments — "[Y]ou know that's wrong. You know that's a lie," and "Another lie . . . . Another distortion of the truth from this defendant" — referred to the defendant's statement to police, during a noncustodial interview on June 14, that Pineda was then employed as a waitress and earning "good money." Citing *Commonwealth* v. *Waite*, 422 Mass. 792, 801 (1996), the defendant claims that the prosecutor's comments were impermissible because they amounted to a "bald assertion" that the defendant, who did not testify on his own behalf, was a "liar." We disagree. In *Commonwealth* v. *Waite*, *supra*, we found error in the Commonwealth's use of postarrest denials in closing argument to challenge a defendant's credibility, because such denials (and the accusations that elicit them) are themselves inadmissible "except as prior inconsistent statements should the defendant testify at trial." *Id.* Here the prosecutor was referring not to postarrest denials of accusations of guilt, but to the defendant's responses to questions in prearrest exchanges, which properly were admitted. There was no error.

The defendant provides no support for his argument that we should extend to statements made during noncustodial, prearrest police questioning, such as those referenced by the prosecutor, our "long-standing rule" prohibiting the use at trial of a defendant's postarrest denials where the defendant chooses not to testify. *Id.* Moreover, as we stated in *Commonwealth* v. *Waite*, *supra*, where a prosecutor improperly comments on a defendant's post-Miranda denials, the error is harmless if the comment was cumulative of other evidence before the jury. *Id.* at 801-802, citing *Brecht* v. *Abrahamson*, 507 U.S. 619, 638-639 (1993). Thus, even if we were inclined to extend the law as the defendant urges, the evidence that clearly contradicted the defendant's statements would be sufficient to negate any concern about prejudice arising from the prosecutor's comments.

The defendant makes a related argument that it was error to admit in any form his denials of guilt made during the post-

Miranda interrogation, the audiotape of which was played for the jury.[10] See *Commonwealth* v. *Womack*, 457 Mass. 268, 273 (2010). Because the defendant did not object at trial, we review any error for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

As we said in *Commonwealth* v. *Womack*, *supra* at 276, "[t]he core of any prejudice [in the admission of postarrest accusations and denials] is more likely caused by admission of the accusations." Here, as in that case, however, the accusations were cumulative of other evidence. *Id.* at 275. Additionally, the accusing officer was available for cross-examination. *Id.* As to the defendant's responses to the accusations, the jury were able "to hear evidence of his prompt, clear, and emphatic denials without his having to testify, something generally of great value to defendants." *Id.* at 276. The latter point is illustrated in defense counsel's repeated use of the denials in his own closing argument, when he stated, for example, "He denied it. He denied, and he denied it again," and "[The defendant] said, 'I didn't go there. I didn't do it.' " Moreover, as we have noted, it was the defendant himself who moved for the admission of the recorded statement, and the Commonwealth's objection to that motion was overruled.[11] In these circumstances, we cannot say that the

---

[10]Representative exchanges include the following:

> *Q.*: "If I told you that I know that you planned the robbery, that you planned the robbery with your girlfriend, and you planned the robbery with your girlfriend's sister, would that change what we're talking about here?"

> *A.*: "No, it won't change it."

> *Q.*: "And if I told you that I know what happened with your clothing, the knife, the tape, would that change anything that [you] have to offer to me?"

> *A.*: "Nothing, absolutely nothing."

> *Q.*: "Okay. So what you're telling me is that you weren't in the store?"

> *A.*: "No."

> *Q.*: "And that you didn't take part in this robbery?"

> *A.*: "No."

[11]The judge and counsel apparently were aware of this unusual posture;

error gave rise to a substantial likelihood of a miscarriage of justice.

b. *Appeals to emotion.* The defendant next contends that the prosecutor improperly appealed to the jury's sympathy by referring to Hernandez as "[t]his woman, this thirty-nine year old woman, she was a sister, she was a daughter, she was a niece, and she is none of these things anymore because of what he did to her. Lourdes Hernandez is only a memory because of this defendant"; by stating that Hernandez's body was discovered "literally in a state of humiliation"; and by observing that unlike her killer, Hernandez "didn't have an opportunity to wash up that day because she was lying in a pool of her own blood on the floor after he brutally stabbed her."

The prosecutor was entitled to "humanize the proceedings" by telling the jury "something of the person whose life has been lost," but he also was required to argue in such a way as to ensure that the verdict was "based on the evidence rather than sympathy for the victim and her family." *Commonwealth v. Santiago*, 425 Mass. 491, 494-495 & n.3 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Although the challenged remarks may have unduly emphasized the loss suffered by Hernandez's family and were better left unsaid, they did not give rise to prejudicial error requiring reversal. Several factors weigh against a finding of prejudice. On the first day of trial, the judge cautioned the jury "not to deal with the case from a position of sympathy or compassion." The prosecutor himself urged the jury in his closing argument "to decide this case based on the evidence entered in this Court, not based on likes or dislikes or sympathy." See *Commonwealth v. Barros*, 425 Mass. 572, 582 (1997). In his charge, the judge properly instructed the jury that they were to focus on the evidence and not be swayed by sympathy. Finally, the Commonwealth's case, while circumstantial, was strong. See *Commonwealth v. Ortiz*, 435 Mass. 569, 579 (2002) (no prejudicial error where prosecutor stated that defendant "made sure that [the victim] never saw her mother, her fiancé, never returned to

---

however, the judge gave no explanation on the record for his decision to admit the recording, other than that its admission would not prejudice the Commonwealth.

her room again, never got married"; case against defendant was "compelling"; statement was isolated in context of whole closing; and jury were instructed not to take emotion or sympathy into consideration).

The defendant maintains also that the prosecutor's repeated use of the words "brutal," "brutally," and "viciously" to describe the attack on Hernandez was inflammatory and constituted improper "harping on the brutality" of the crime scene. *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 295 (1990). Because the violent nature of the murder was relevant to whether it was committed with extreme atrocity or cruelty, the remarks were not improper. See, e.g., *Commonwealth* v. *Wilson*, 427 Mass. 336, 351 (1998) (*Wilson*), citing *Commonwealth* v. *Raymond*, 424 Mass. 382, 389-390 (1997) ("the gruesomeness of the crimes and the suffering of the victims were relevant to the issue whether the defendant's actions constituted extreme atrocity or cruelty").

c. *Improper vouching.* The defendant claims the prosecutor's statements that Hernandez died "because of what he did to her," and was "only a memory because of this defendant," were the "moral equivalent of vouching" for the Commonwealth's case, because they implied the prosecutor's personal belief in the defendant's guilt. The argument is unavailing. Improper vouching occurs where an attorney "expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury." *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Wilson, supra* at 352. Neither circumstance is present here. Moreover, we presume the jury "know that the prosecutor is an advocate," *Wilson, supra* at 351, quoting *Commonwealth* v. *Coleman*, 366 Mass. 705, 714 (1975), and that they recognize arguments "as advocacy and not statements of personal belief." *Wilson, supra* (no error where prosecutor stated that jury were in presence of "a triple murderer"). See *Commonwealth* v. *Sanna*, 424 Mass. 92, 107-108 & n.19 (1997) (no error in prosecutor's statement, "The defendant is responsible for this vicious act and no one else"). We conclude that the prosecutor was merely "arguing what conclusion the jury should draw from the evidence." *Commonwealth* v. *Ruiz*, 442 Mass. 826, 837 (2004).

d. *Rhetorical flourish.* At the end of his argument, the prosecutor stated, "In every man's life, in every person's life, there comes a time to be held accountable. And for [the defendant], that time is now." The defendant maintains that this statement contained circular reasoning and improperly suggested that the purpose of deliberation was solely to return a conviction.

A prosecutor may argue forcefully for a conviction, and "[e]nthusiastic rhetoric . . . and excusable hyperbole" will not be grounds for reversal. *Wilson, supra* at 350, quoting *Commonwealth* v. *Sanna, supra* at 107. We conclude that the statement here falls within the category of permissible rhetoric and that there was no error.

2. *Reasonable doubt instruction.* The defendant contends that the jury charge on reasonable doubt misstated the law and denigrated the Commonwealth's burden of proof.[12] The Commonwealth, citing *Commonwealth* v. *Casale,* 381 Mass. 167,

---

[12]We set forth the instruction in its entirety, adding emphasis to the portion that the defendant challenges:

"The burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charges made against him. What is proof beyond a reasonable doubt? The term is often used and pretty well understood, though it is not easily defined. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt if, after you have compared and considered all of the evidence, you have in your minds an abiding conviction, to a moral certainty, that the charge is true.

"I have told you that every person is presumed to be innocent until he or she is proved guilty, and that the burden is on the Commonwealth. If you evaluate all the evidence and you still have a reasonable doubt remaining, the defendant is entitled to the benefit of that doubt and must be acquitted.

"It is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty. That is not enough. Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty, a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence. That is what we mean by proof beyond a reasonable doubt.

"*While the Commonwealth is required to prove the defendant's guilt beyond a reasonable doubt, the Commonwealth is not required to exclude*

175-176 (1980), had requested that the challenged portion of the instruction be given separately during the jury charge. However, the judge deemed it appropriate to include those sentences in the instruction on reasonable doubt, "given the texture of some of the defense approach to their submission to the jury."

First, it is well established that the Commonwealth need not "exclude every other hypothesis to the effect that a person or persons other than the [defendant] committed the offense" in a given case. *Id.*, citing *Commonwealth* v. *Montecalvo*, 367 Mass. 46 (1975). The instruction therefore was an accurate statement of the law.

As to whether the challenged language, when included in a reasonable doubt instruction, could have confused the jury with respect to the Commonwealth's burden of proof, we have in the past approved the use of similar language in a jury charge. See *Commonwealth* v. *Adrey*, 376 Mass. 747, 756 (1978) (no error where judge twice stated in his reasonable doubt instruction that "the Commonwealth [need not] prove that a criminal act could not have been done by anybody else other than the [d]efendant or . . . that no other person than the [d]efendant had an opportunity to do it"). See also *Commonwealth* v. *Pires*, 389 Mass. 657, 664 (1983) (declining to "condemn all 'negative' language which tells the jury what does *not* constitute proof beyond a reasonable doubt" [emphasis in original]). We note also that in this case the judge concluded his instruction by stressing that the possible existence of another perpetrator or participant was a factor for the jury to consider in weighing the evidence. Cf. *Commonwealth* v. *Adrey*, *supra* ("It was not necessary . . . for the judge to explain in addition the obvious point that the possibility of another perpetrator might create a reason-

---

*every other possible hypothesis to the effect that a person or persons other than the defendant committed the offense.*

"*In other words, it is not necessary for the Commonwealth to prove that no one other than the defendant could have performed or participated in the acts alleged in this case. That another person might have had such an opportunity goes only to the weight of the evidence, which evidence is for you, the jury, to decide.*"

able doubt"). The defendant was not prejudiced by the instruction.[13]

3. *G. L. c. 278, § 33E, review.* The defendant argues that, even if individual errors do not separately constitute a basis for reversal, the combination of errors warrants a new trial. We disagree. We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and have identified no reason to reverse the defendant's conviction or reduce it to a lesser degree of guilt.

*Judgment affirmed.*

---

[13]Although we conclude there was no error, we think the better practice is to give such instruction as part of a so-called *Bowden* instruction, see *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), rather than as part of the reasonable doubt instruction.