NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11508

COMMONWEALTH  vs.  SANDRO TAVARES.


Suffolk.     January 9, 2015. - May 14, 2015.

Present: Gants, C.J., Spina, Cordy, Botsford, & Duffly, JJ.


Homicide. Joint Enterprise. Evidence, Joint venturer, Intent, Argument by prosecutor, Firearm. Intent. Malice. Jury and Jurors. Practice, Criminal, Instructions to jury, Question by jury, New trial, Argument by prosecutor, Capital case. Firearms. License.


Indictments found and returned in the Superior Court Department on October 27, 2009.

The cases were tried before Elizabeth B. Donovan, J.


Dennis Shedd for the defendant.
Sarah Montgomery Lewis, Assistant District Attorney (John P. Pappas, Assistant District Attorney, with her) for the Commonwealth.


BOTSFORD, J.  In October, 2011, a jury in the Superior Court convicted the defendant of murder in the first degree based on deliberate premeditation in connection with the fatal

shooting of Manuel Monteiro and Jovany Eason.[1]  The defendant did not fire the gun that killed the victims, but was convicted on a theory of joint venture with the shooter, who took the gun from the defendant's hand and began shooting.

On appeal, the defendant argues that there was insufficient evidence to convict him of murder in the first degree based on a joint venture theory, that the judge erred in not instructing the jury on involuntary manslaughter and in misstating the law of joint venture in her response to a jury question, and that the prosecutor made improper statements in his closing argument.[2] We conclude that the judge's mistaken response to the jury question regarding the law of joint venture created a substantial likelihood of a miscarriage of justice.  Therefore, we vacate the defendant's conviction on the murder charges and remand for a new trial on those indictments.[3]

---

[1] The defendant was tried with a codefendant, Emmanuel Pina, who also was convicted of murder in the first degree and a related firearm possession offense.  This appeal concerns only the defendant.  Pina's appeal from his convictions remains pending.

[2] The defendant argues, in the alternative, that he received ineffective assistance of counsel.  Because we resolve this case on the issue of the response to the jury question, we do not discuss the defendant's argument regarding ineffective assistance of counsel.

[3] The defendant also challenges his conviction of possession of a firearm without a license in violation of G. L. c. 269,

Background.  Because the defendant challenges the sufficiency of the evidence presented, we summarize the facts the jury could have found in the light most favorable to the Commonwealth.  See Commonwealth v. Earle, 458 Mass. 341, 342 (2010).  We reserve certain facts for further discussion in connection with other issues raised.

Around 1 A.M. on August 2, 2009, an argument erupted at a bar and restaurant (bar) in the Dorchester section of Boston that was a popular gathering spot for members of the Cape Verdean community.  The argument led to a physical fight in the restroom of the bar, and later to the fatal shooting of the two victims.  Much of the incident was recorded by surveillance cameras inside and outside the bar and outside a building across the street.

The argument began shortly after the defendant and a companion, Stephen Depina, arrived at the bar.[4]  The defendant embraced a friend who was at the bar and said to him, "I don't understand why you hang with the Draper Street niggas."  Eason, who was standing behind the defendant at the time, and who was friendly with people from the Draper Street neighborhood,

_____

§ 10 (a).  We conclude that there was no error related to this conviction.

[4] That night, the defendant was wearing a distinctive black shirt with white writing, which is visible on the surveillance footage.

overheard this comment, and an angry exchange ensued. Adilson Resende was working security at the bar that night, and he separated the two men; immediately thereafter, the defendant left the bar with Depina. Once outside, the defendant and Depina turned right and walked south.

Inside the bar, the dispute continued. Otelino Goncalves, another patron, argued with Eason; other men became involved as well, and the argument moved to the restroom. Around the same time, the defendant's codefendant, Emmanuel Pina, approached the bar from the south, crossed to the other side of the street, and, less than a minute later, came back across the street and entered the bar.[5] Once inside, Pina headed directly to the restroom and joined Goncalves in arguing with Eason and two of Eason's friends. The owner of the bar attempted to quell the argument, but the situation quickly escalated into a physical fight, with punches and kicks being thrown, and Resende and a bartender rushed in to intervene. Goncalves and Pina were forced out of the restroom and out the front door of the bar, with Goncalves exiting first, Pina second, and Adelberto Brandao (another patron who had assisted the employees in removing

---

[5] The prosecutor asserted in his closing argument that the surveillance video showed Pina first approaching the area outside the bar several minutes earlier, alongside the defendant and Stephen Depina. However, we view the video evidence referred to as inconclusive on this point, even when viewed in the light most favorable to the Commonwealth.

Goncalves and Pina) third. Eason left the bar on his own about fifteen seconds ahead of Goncalves and Pina and headed to his motor vehicle, which was parked right in front of the bar.

While the fight was developing inside the restroom, the defendant and Stephen Depina returned to the area outside the bar; the defendant was carrying a gun. The defendant waited by the side of the bar for a few seconds before moving back to the sidewalk in front of the building and then crossing to the other side of the street.

As Eason was opening his vehicle's door to leave, Goncalves approached him, and the two squared off in the middle of the street as if to engage in a second round of their earlier fight. Before the fight began, however, the defendant approached Eason from the sidewalk across the street and pointed the gun at him. Joao Depina, another patron who was inside the bar watching this scene through a window, saw the defendant try to "rack" the gun, meaning to pull the slide back in order to position a bullet in the chamber so that the gun could be fired. Eason pointed his hand at the defendant, and the men backed away from one another.

Pina then grabbed or took the gun from the defendant.[6] With gun in hand, Pina ran toward Eason, shooting at him. One shot

---

[6] The transfer of the gun from the defendant to Pina was not recorded on the surveillance cameras. Although there was some uncertainty as to the exact manner in which Pina took the gun

broke through a window near the front door of the bar and hit Monteiro (a cook in the restaurant portion of the bar who was standing at the window watching the altercation outside) in the chest. Monteiro collapsed shortly after being hit; he died from the gunshot wound and was pronounced dead at the scene.

Eason, meanwhile, was running north up the street followed by Pina, who was continuing to shoot at him, hitting Eason multiple times in the back. A few seconds behind Pina ran Brandao and the defendant. At an intersection, Eason turned left, where he fell to the ground and was later discovered by police officers. Pina turned right and ran up another street. The defendant followed Pina to the corner of the intersection, but then turned and ran off in another direction. Emergency medical personnel arrived shortly thereafter and transported Eason to Boston Medical Center, but he died of gunshot wounds before arriving at the hospital.

The defendant as well as Pina were indicted for the murders of Monteiro and Eason and for possession of a firearm without a license in violation of G. L. c. 269, § 10 (a). In late November, 2009, approximately one month after the defendant's indictments issued, the defendant was arrested in Atlanta,

---

from the defendant, a point we discuss infra, the witnesses agreed that the defendant made no attempt to withhold the gun from Pina.

Georgia, where he had been living under an assumed name.  He and Pina were tried before a jury in September, 2011, and at the close of the evidence, the defendant moved for a required finding of not guilty, which was denied.  The judge instructed the jury on principles of joint venture and transferred intent.  After deliberation, the jury convicted the defendant and Pina of murder in the first degree of both victims on the theory of deliberate premeditation.[7]  The jury also found the defendant guilty of the firearm possession charge.  The defendant filed a timely appeal from his convictions.

Discussion.  1.  Sufficiency of the evidence.  The defendant contends that the judge erred in declining to grant his motion for a required finding of not guilty, because there was insufficient evidence to convict him of deliberately premeditated murder.  As previously noted, we consider the evidence on this issue in the light most favorable to the Commonwealth, and, "drawing all inferences in [the Commonwealth's] favor," ask whether evidence existed to "permit a rational jury to find each essential element of the crime beyond a reasonable doubt."  Earle, 458 Mass. at 346.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

---

[7] During deliberations, the jury submitted a question to the judge concerning whether joint venturers must both be convicted of the same offense.  We discuss this question in part 2.b, infra.

Because the defendant's murder convictions were based on his role in the killings as a joint venturer, the Commonwealth was required to prove to the jury that "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009). "The defendant's intent may be inferred from his knowledge of the circumstances and participation in the crime," Commonwealth v. Norris, 462 Mass. 131, 139 (2012), quoting Commonwealth v. Carnes, 457 Mass. 812, 823 (2010), and any inferences drawn "need only be reasonable and possible, and need not be necessary or inescapable." Commonwealth v. Elliot, 430 Mass. 498, 500 (1999), quoting Commonwealth v. Pucillo, 427 Mass. 108, 113 (1998).

The defendant clearly was present at the scene of the murders and actively participated in the events leading to the two victims' deaths, thereby meeting the first part of the test for joint venture. See Commonwealth v. Akara, 465 Mass. 245, 253 (2013). However, the defendant contends that he lacked the intent required to sustain a conviction of murder in the first degree based on deliberate premeditation and that, therefore, the second prong of the test for joint venture -- possession of the requisite intent for the offense, see id. -- was absent with respect to this crime. Thus, the question regarding the

sufficiency of the evidence is whether the evidence concerning the defendant's intent was sufficient.

In order to have committed murder in the first degree with deliberate premeditation, a defendant must have had or shared an "intent to kill or cause death," Norris, 462 Mass. at 139, which was the "product of 'cool reflection.'" Zanetti, 454 Mass. at 455, quoting Commonwealth v. Freeman, 442 Mass. 779, 783 (2004). Commonwealth v. Gambora, 457 Mass. 715, 732 (2010), quoting Commonwealth v. Coleman, 434 Mass. 165, 167 (2001). "[N]o particular period of reflection is required, and . . . a plan to murder may be formed in seconds." Gambora, supra at 733, quoting Coleman, supra at 168. Thus, if there was evidence presented from which the jury could infer that the defendant intended to kill Eason, and the decision was the result of some period of reflection, however short, then the defendant's motion for a required finding of not guilty was properly denied.[8]

Here, the jury could have found that Pina intended to kill Eason, and that the defendant shared that intent. First, the

---

[8] As the judge instructed the jury, any intent that the defendant had to kill Jovany Eason also applied to Manuel Monteiro, according to the doctrine of transferred intent. See Commonwealth v. Taylor, 463 Mass. 857, 863 (2012) (where defendant intended to kill one victim, but in attempting to do so caused another victim's death, defendant is treated as if he intended to kill bystander). The defendant does not challenge the adequacy of the transferred intent instruction or its application to this case, and our own review indicates that the instruction was correct.

evidence that Pina fought in the restroom with Eason, and that Pina then obtained a gun and ran after Eason repeatedly firing at him, is sufficient to support a guilty verdict for Pina of murder in the first degree based on deliberate premeditation. See Commonwealth v. Williams, 422 Mass. 111, 123 (1996). Turning, then, to the defendant's conduct, and drawing all reasonable inferences in the Commonwealth's favor, the jury could have found that the defendant's actions demonstrated "knowledge of the circumstances and participation in the crime," leading to the conclusion that the defendant shared Pina's intent with respect to killing Eason.  See Norris, 462 Mass. at 139.  Considered in the light most favorable to the Commonwealth, the defendant's argument with Eason inside the bar sparked the entire violent encounter.  While others continued the argument, the defendant obtained the weapon that was ultimately used to kill Eason and went back to wait near the bar, suggesting that the defendant knew what was happening inside and that he was lying in wait for Eason to come out with the others who had been fighting.  When Eason emerged from the bar, the defendant pointed the gun at Eason and attempted to put a bullet in the chamber, so that the gun could be fired at any moment.  See Commonwealth v. Smith, 456 Mass. 476, 488 (2010) (jury "may infer an intent to kill from the use of a firearm"). Although the defendant did not shoot Eason himself, he allowed

Pina to take the gun from him and then ran behind Pina as Pina pursued Eason. Thus, from the defendant's actions, the jury reasonably could conclude that the defendant planned to kill Eason, that he participated in the killing by obtaining the murder weapon, and that he allowed or encouraged Pina to follow through with the murder. See Akara, 465 Mass. at 255-256 (defendant could have been found to have shared principal shooter's intent, where jury could have inferred that defendant passed gun to principal, stood by principal as he fired, and fled scene with principal); Commonwealth v. Brooks, 422 Mass. 574, 577 (1996) (even if defendant did not shoot victim, evidence that defendant carried firearm, obscured his face, and fled scene with shooters supported conviction of murder in first degree).[9]

---

[9] The defendant relies on Commonwealth v. Elliot, 430 Mass. 498 (1999), to support his argument that in the present case, there was insufficient evidence of his intent to kill with deliberate premeditation. In Elliot, the defendant passed a gun to the principal shooter, who had made clear his intent to shoot the victim; the jury found the principal shooter guilty of murder in the first degree, and the defendant guilty of murder in the second degree. See id. at 498-500. We agree with the defendant that in Elliot, there was more direct evidence of the defendant's intent in passing the gun to the principal than there is in the present case. Nevertheless, for the reasons just discussed in the text, we conclude that, here, there was sufficient evidence presented for the jury to have inferred that the defendant possessed the required intent for the crime of murder in the first degree.

2. <u>Jury issues</u>. The defendant argues that the judge erred in instructing the jury and in responding to a jury question. First, although the defendant did not request an involuntary manslaughter instruction, or object when the judge did not give one,[10] the defendant asserts that the evidence warranted this instruction and that the judge committed error in not giving it. Second, the defendant argues that the judge committed a separate error in the response she gave to the jury when they sought clarification on the law as it pertains to joint venture. The defendant did not object at that time to the judge's response to the jury question. Because the defendant did not raise these issues during the trial, we review to determine if they created a substantial likelihood of a miscarriage of justice. See <u>Commonwealth</u> v. <u>Figueroa</u>, 468 Mass. 204, 223 (2014).

a. <u>Involuntary manslaughter</u>. Notwithstanding the fact that the defendant did not pursue an involuntary manslaughter instruction at trial, on review, it is clear that the facts, when considered in the light most favorable to the defendant, see <u>Commonwealth</u> v. <u>Acevedo</u>, 446 Mass. 435, 443 (2006),

---

[10] At the charge conference, Pina's trial counsel did request instructions on voluntary and involuntary manslaughter, which the trial judge declined to give. The defendant's trial counsel indicated that he was content with the murder instructions and did not object during the charge conference or at the close of the charge.

supported such an instruction.[11]  An instruction on involuntary

manslaughter also would have been consistent with the

defendant's trial strategy.[12]

At the close of trial, the judge instructed the jury on

murder in the first and second degrees.  Malice, for purposes of

murder in the second degree, may consist of the intent to kill;

the intent to cause grievous bodily harm; or the intent to

commit an act that, in the circumstances known to the defendant,

created a plain and strong likelihood of death (third prong

malice).  See Earle, 458 Mass. at 346-347.  A "fine line"

distinguishes murder in the second degree based on third prong

malice from involuntary manslaughter, see Commonwealth v. Lyons,

444 Mass. 289, 293 (2005), which has been defined as "an

unintentional, unlawful killing caused by wanton or reckless

---

[11] Because the defendant's intent was open to multiple
interpretations based on the evidence, considering the facts in
the light most favorable to the defendant, rather than to the
Commonwealth, plays a significant role in our analysis of what
crime the jury could have found that the defendant committed.
Thus, although we concluded, supra, that the trial evidence was
sufficient to support a conviction of murder in the first
degree, viewed differently, the same evidence also could have
supported a conviction of involuntary manslaughter.

[12] In closing, the defendant's trial counsel argued as his
principal point that neither the video evidence nor any other
evidence reliably showed that it was the defendant who brought
the gun to the scene.  But trial counsel's alternative argument
was that even if the defendant was the person who obtained the
gun and pointed it at Eason, there was no evidence from the
defendant's actions that he intended to kill Eason.

conduct."[13]  Earle, supra at 347.  "The difference between the elements of the third prong of malice and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew.  The risk for the purposes of third prong malice is that there was a plain and strong likelihood of death . . . [whereas] [t]he risk that will satisfy the standard for . . . involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.'"  Lyons, supra, quoting Commonwealth v. Sires, 413 Mass. 292, 303 n.14 (1992).  See Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998), S.C., 431 Mass. 360 (2000), and 447 Mass. 1017 (2006).  Thus, where a defendant is charged with murder, an instruction on involuntary manslaughter is appropriate if any "reasonable view of the evidence would [permit] the jury to find 'wanton and reckless' conduct rather than actions from which a 'plain and strong likelihood' of death would follow."  See Commonwealth v. Braley, 449 Mass. 316, 331

---

[13] This court has described conduct amounting to involuntary manslaughter as both "wanton or reckless" and "wanton and reckless."  See Commonwealth v. Chase, 433 Mass. 293, 301 (2001).  Expressed either way, the words articulate a single standard, not two.  See id.

(2007), quoting Commonwealth v. Jenks, 426 Mass. 582, 585
(1998).[14]

In this case, although the defendant brought the gun to the
scene and pointed it at Eason, the defendant never fired the
gun.  Moreover, much of the defendant's handling of the gun
occurred out of view of the surveillance cameras,[15] and the
nature of the events that were not captured on camera was in
dispute.  For example, the jury could have found that the
defendant never tried to "rack" the gun and, instead, simply
pointed the gun at Eason and then backed away.[16]  The jury also
could have found that Pina grabbed the gun unexpectedly from the
defendant, and that the defendant did not know Pina would take

---

[14] The Commonwealth argues that in order for the defendant
to be convicted of involuntary manslaughter, the jury would have
to find that Monteiro's and Eason's deaths were the result of
wanton or reckless conduct, because the Commonwealth proceeded
against the defendant based on a theory of joint venture.
However, this presumes that the defendant and Pina could only
have been found guilty of the same crime, which is not the case.
See, e.g., Commonwealth v. Cunningham, 405 Mass. 646, 658-659
(1989).  We return to this point infra.

[15] One of the cameras in front of the bar shows the
defendant walking into view pointing the gun at Eason, and then
backing out of view.  Seconds later, the camera shows Pina
running back into view with the gun.

[16] Although Joao Depina testified on direct examination that
he saw the defendant try to "rack" the gun, the jury also heard
evidence that during this witness's first interview with police,
which was the same night as the shootings, he did not say this.
Rather, in his first interview, he reported that he saw the
"second guy" (Pina) playing with the gun and then shooting it.

the gun or that he would fire it.[17]  Had the jury reached these conclusions, they might have also believed, as the defendant now suggests, that the defendant's actions of returning to the area outside of the bar and pointing the gun at Eason were meant only to scare or intimidate him, and not to kill him.  See Commonwealth v. Lewis, 465 Mass. 119, 126 (2013) (evidence that defendant pointed loaded gun at victim "might imply an intent to kill, but it equally implies an intent to frighten and deter").  The jury could therefore have determined that a reasonable person with the defendant's intent toward Eason and subjective knowledge of the circumstances might not have anticipated that his actions would likely lead to Eason's death, but would certainly have understood that he had created a high degree of likelihood of substantial harm to Eason.[18]  Compare Commonwealth

---

[17] As previously noted, although the prosecutor suggested that Pina arrived at the area outside the bar with the defendant and Stephen Depina, the evidence supporting this inference was inconclusive.  Thus, the jury could have found that the defendant and Pina were never in the same place at the same time before the moment that the defendant appeared pointing the gun at Eason, a conclusion that is consistent with the theory that the defendant was surprised by Pina's actions of grabbing and shooting the gun.

[18] It is true that, in general, firing a gun at a person or group of people is presumed to create a plain and strong likelihood of death, rather than wanton and reckless conduct. See, e.g., Commonwealth v. Braley, 449 Mass. 316, 332 (2007); Commonwealth v. Jenks, 426 Mass. 582, 586 (1998); Commonwealth v. Alebord, 68 Mass. App. Ct. 1, 7 (2006), S.C., 467 Mass. 106,

v. Horne, 466 Mass. 440, 444-446 (2013) (firing at covered window of home late at night created high degree of likelihood of substantial harm to another, but not plain and strong likelihood of death). Contrast Commonwealth v. Childs, 445 Mass. 529, 533-534 (2005) (pointing loaded, cocked gun into occupied motor vehicle created plain and strong likelihood of death due to gun's close proximity to vehicle's occupants and potential for gun to fire); Elliot, 430 Mass. at 500 (pointing gun and then passing it to companion who had made plain his intent to shoot victim constituted conduct from which plain and strong likelihood of death would result).

The facts of this case thus could have been reasonably interpreted in a manner that warranted an instruction on involuntary manslaughter. However, in the absence of any request by the defendant for such an instruction, or of any indication that the defendant brought this interpretation of the facts to the judge's attention, the judge was not required to give the instruction sua sponte. See Commonwealth v. Berry, 431 Mass. 326, 337-338 & n.15 (2000), citing Commonwealth v. Roberts, 407 Mass. 731, 737 (1990) (judge not required to charge on lesser included offense, absent request). Cf. Commonwealth v. Stokes, 460 Mass. 311, 315 (2011) (in trial resulting in

cert. denied, 134 S. Ct. 2830 (2014). But, here, the defendant did not fire the gun.

murder conviction, no error occurred requiring allowance of defendant's motion for new trial where judge did not instruct on lesser included offense supported by evidence and no party had requested such instruction).  Nevertheless, the fact that such an instruction would have been appropriate had one been requested remains important as we consider the impact of the next error that the defendant claims.

b.  Response to jury question regarding joint venture.[19] During deliberations, the jury submitted to the judge the following question:  "If person A aids and abets person B, does the degree of charge of person B affect the degree of charge of person A?"  The judge interpreted this question as:  "[i]s the aider and abettor liable to the same degree as the perpetrator?" and responded to the jury that "[t]he aider and abettor is liable to the same degree as the perpetrator of the crime."  The defendant's trial counsel indorsed this interpretation of the jury's question and the judge's response.  However, on appeal, the defendant argues that this response constituted error, because it obscured the fact that one who aids and abets the

_____

[19] Following closing arguments, the judge instructed the jury on the concept of joint venture using the language of "aiding and abetting" that this court indorsed in Commonwealth v. Zanetti, 454 Mass. 449, 467, 470 (2009).  On appeal, the defendant objects not to the judge's initial instructions on joint venture, but only to her response to the jury's question.

commission of a crime need not necessarily be convicted of the same offense as the principal.

In the context of this case, the jury's question was open to more than one interpretation. The question could have meant that the jury had already decided that Pina had committed murder in the first degree, and that the defendant, by actively participating with Pina in the crime <u>and</u> sharing the intent necessary, had aided and abetted Pina in the commission of that offense; if the jury had reached this judgment, then the judge properly conveyed in her response that the defendant was liable for that offense to the same degree as Pina. However, it is equally possible the question meant the jury had determined that Pina was guilty of murder in the first degree and that the defendant had "aided and abetted" the killings in some fashion, but the jury had not yet decided whether the defendant met all of the elements required to convict him of murder in the first degree as well -- and perhaps most specifically, the element of intent.

If the jury's question is understood in this second way, the judge's response becomes misleading, because it suggests that if the jury found that the defendant aided or assisted Pina in the killings and that Pina was guilty of murder in the first degree, then the jury were <u>required</u> to also find the defendant guilty of first-degree murder. This is incorrect. Two or more

defendants may have knowingly participated together in a criminal act, such as an unlawful killing, but may have had different mental states or levels of culpability with respect to that act. In such a situation, each participating defendant may nevertheless be convicted as an aider and abettor (or joint venturer), so long as each participant had, at a minimum, the mental state required for the particular offense or offenses of which he or she was convicted. See Commonwealth v. Wood, 469 Mass. 266, 268 & n.2, 293-295 (2014) (in circumstances of case, jury could have found two defendants to have participated as joint venturers in some or all of several crimes charged [including kidnapping, robbery, murder, and assault and battery by means of dangerous weapon] but could have also "assign[ed] a different level of culpability in the resulting murder, so long as the [two defendants] each had, at a minimum, the required intent for the crimes of which they were convicted"); Commonwealth v. Cunningham, 405 Mass. 646, 647-648, 658-659 (1989) (in group assault case where one defendant killed victim and was convicted of murder in first degree, codefendants could be convicted of manslaughter if jury found that codefendants only intended to commit assault and battery). Accordingly, we have not required that all who participate as joint venturers in a single killing be found guilty of the same offense. See Wood, supra at 294; Cunningham, supra at 658-659. See also Elliot,

430 Mass. at 498-500 (codefendants tried for murder as joint venturers; defendant who did not shoot victim convicted of murder in second degree; shooter convicted of murder in first degree).

Given the unique context of this trial, in which the evidence that Pina committed murder in the first degree based on deliberate premeditation was strong,[20] but the evidence of the defendant's intent was open to a number of different interpretations, it was error for the trial judge to respond to the jury's question in a way that eliminated the possibility that the defendant could be found guilty of a lesser offense than Pina. We turn then to the question whether this error, when considered along with the lack of an instruction on involuntary manslaughter, created a substantial likelihood of a miscarriage of justice requiring a new trial for the defendant.

Where there has been an error in a trial resulting in a conviction of murder in the first degree, "a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same." Figueroa, 468 Mass. at 229, quoting Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998). We cannot be confident that the jury

---

[20] Pina was shown on the surveillance video chasing Eason with a gun, and Brandao testified that he saw Pina shooting at Eason as they ran.

would still have returned a verdict of guilty of murder in the first degree had the judge not erroneously indicated that the defendant, if found to have aided and abetted Pina, had to be convicted of the same offense as Pina.  As we have discussed, that the defendant knowingly participated in the deaths of Eason and Monteiro was clear based on the evidence, but whether the defendant's state of mind leading up to and during the killings amounted to malice was a question of fact that the jury could have resolved in more than one way.  Even assuming that the jury did conclude that the defendant acted with malice, they could have found the defendant guilty of murder in the second degree rather than in the first degree.  See Wood, 469 Mass. at 294. This result was a real possibility, given that the defendant was not the shooter, and the jury may have therefore concluded that he was less culpable for the deaths than Pina.  See id. at 294-295 (jury may act within their discretion in deciding to hold principal murderer responsible to greater degree than joint venturer).  See also Elliot, 430 Mass. at 498-500.  Any confidence that the jury verdict would have been the same absent the error is further weakened by the facts that (1) the judge did not explain to the jury during her instructions on joint venture that the codefendants could be convicted of different offenses; and (2) the evidence relating to the defendant would have supported an instruction on involuntary manslaughter, even

though, as earlier discussed, the absence of such an instruction was not error.

In sum, the jury could have found the defendant guilty of a less severe offense than murder in the first degree.  Because the response to the jury's question obscured or eliminated the possibility that the defendant could be convicted of any lesser offense, the response created a substantial likelihood of a miscarriage of justice, and the defendant is entitled to a new trial.

3.  Prosecutor's closing argument.  Because the defendant asserts that several aspects of the prosecutor's closing argument were improper, issues that may arise again at retrial, we comment briefly on each of the defendant's objections.

a.  Appeals to sympathy.  The defendant first argues that the prosecutor improperly appealed to the jury's sympathy by referring to Monteiro as "an uncle, a husband, and a friend to many people and he's none of those things anymore," and by stating that Monteiro "did not deserve to wind up dead under a sheet on the floor in the restaurant where he worked with a bullet in his chest."

"The prosecutor was entitled to 'humanize the proceedings' by telling the jury 'something of the person whose life has been lost,' but he also was required to argue in such a way as to ensure that the verdict was 'based on the evidence rather than

sympathy for the victim and [his] family.'" Commonwealth v. Mejia, 463 Mass. 243, 253 (2012), quoting Commonwealth v. Santiago, 425 Mass. 491, 494-495 & n.3 (1997), S.C., 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Thus, we have suggested that remarks that unduly emphasized the loss suffered by a victim's family, while not prejudicing the defendant, "were better left unsaid." Mejia, supra. Similarly, a prosecutor's statement that the victim "didn't deserve to die this way" has been held improper, because it had no relevance to the question of the defendant's guilt, although it did not create a substantial likelihood of a miscarriage of justice. Commonwealth v. Gentile, 437 Mass. 569, 580 (2002). The prosecutor's comments in the present case were similar. Although it was appropriate for the prosecutor to humanize the victims in his closing argument, placing unnecessary emphasis on the losses suffered by the victims' families and on the unforeseeable nature of Monteiro's death was improper and should be avoided.

b. References to malice. Next, the defendant argues that the prosecutor improperly asked the jury to infer that the defendant acted with malice based only on the defendant having pointed the gun at Eason. The defendant objects to the following statements by the prosecutor:

"This fellow right here, Sandro Tavares, malice, taking the gun, pointing it at him. What is his intent? He had every opportunity to walk away that night. He had walked away. But he came back with a purpose and part of his purpose was a 45-caliber semi-automatic weapon. That's malice, pointing it at someone. [Was] it his intent just to scare him? Well, you saw him in the aftermath that that clearly wasn't the intent when the bullets started flying. Specific intent to kill."

Some of the prosecutor's statements ("malice, taking the gun, pointing it at him;" "[t]hat's malice, pointing it at someone") do suggest that the jury could infer malice directly from the defendant's act of pointing the gun at Eason. Such a suggestion, when not combined with other facts that support the inference, is improper, because although we have said that malice may be inferred from the act of shooting at someone, we have not adopted the same inference merely from pointing a gun. See Braley, 449 Mass. at 332. Contrast Lewis, 465 Mass. at 126. Thus, although the prosecutor referenced the defendant leaving and returning to the scene, and later referenced the subsequent shootings, we agree with the defendant that the cited statements improperly suggested to the jury that the act of pointing the gun at Eason alone was enough to find malice.

c. References to accountability. Finally, the defendant argues that the prosecutor, in his closing, improperly made repeated references to holding the defendant accountable for his actions. Although some cases have suggested that directing the jury to hold the defendant accountable is improper, see

Commonwealth v. Jenkins, 458 Mass. 791, 796-797 (2011); Commonwealth v. Torres, 437 Mass. 460, 464-465 (2002), others have viewed such remarks as "characteristic of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' [that do] not cross the line between fair and improper argument." Commonwealth v. Freeman, 430 Mass. 111, 120 (1999), quoting Commonwealth v. Lyons, 426 Mass. 466, 472 (1998). Here, where the prosecutor's references to the defendant's accountability for his actions were each connected to specific acts of the defendant that were in evidence, the comments were not improper.

4. Possession of a firearm. The defendant also was convicted of possession of a firearm without a license in violation of G. L. c. 269, § 10 (a). The parties agree that, ordinarily, the Commonwealth is not required to prove that a defendant does not have a license to carry a firearm unless the defendant comes forward with evidence of a license. See Commonwealth v. Gouse, 461 Mass. 787, 802 (2012). The defendant argues, however, that the judge's instructions on the elements of the crime of unlawful possession of a firearm included a reference to the absence of a license, and that therefore the Commonwealth was required to prove that the defendant did not have a license.

The defendant's argument is without merit. In general, when reviewing jury instructions "[w]e evaluate the instruction

as a whole," rather than "consider[ing] bits and pieces . . . in isolation" (citation omitted).  <u>Commonwealth</u> v. <u>Young</u>, 461 Mass. 198, 207 (2012).  Here, the judge prefaced her instruction on unlawful possession of a firearm by stating explicitly to the jury that license was not an issue in this case, and that they were not required to consider the issue of the defendant's possession of a license.  Considering the judge's instructions as a whole in light of that statement, the jury clearly would have understood that the Commonwealth did not have to prove that the defendant did not have a gun license.  Thus, "[t]he balance of the instructions conveyed the proper law."  <u>Id</u>. at 210.

5.  <u>Conclusion</u>.  For the foregoing reasons, the defendant's conviction of murder in the first degree is reversed, and the case remanded to the Superior Court for a new trial.  The conviction of possession of a firearm without a license in violation of G. L. c. 269, § 10 (<u>a</u>), is affirmed.

<u>So ordered</u>.